**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REAL INDUSTRY, INC., *et al.*[1] | ) | Case No. 17-12464 (___) |
| | ) | |
| Debtors. | ) | Joint Administration Pending |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED
FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, AND 507
(II) AUTHORIZING POSTPETITION USE OF CASH COLLATERAL AND OTHER
PREPETITION COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES, (IV) SCHEDULING A FINAL HEARING
PURSUANT TO BANKRUPTCY RULE 4001(B), AND
<u>(V) GRANTING RELATED RELIEF</u>**

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Real Industry, Inc. (3818), Real Alloy Intermediate Holding, LLC (7447), Real Alloy Holding, Inc. (2396), Real Alloy Recycling, Inc. (9798), Real Alloy Bens Run, LLC (3083), Real Alloy Specialty Products, Inc. (9911), Real Alloy Specification, Inc. (9849), ETS Schaefer, LLC (9350), and RA Mexico Holding, LLC (4620). The principal place of business for the Real Alloy Debtors is 3700 Park East Drive, Suite 300, Beachwood, Ohio 44122.

By this motion (the "Motion"),[2] Real Industry, Inc. ("Real Industry") and its affiliated debtors and debtors-in-possession (the "Real Alloy Debtors," and with Real Industry, collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") respectfully represent as follows:

**Preliminary Statement**

1.      As discussed in detail in the First-Day Declaration, the Real Alloy Debtors have an immediate need for postpetition financing in order to administer the Chapter 11 Cases, continue to operate the Real Alloy Debtors' business, preserve and maximize the value of their assets for the benefit of their creditors and other stakeholders, and consummate a sale of substantially all of their assets.  Virtually all of the Real Alloy Debtors' cash, and substantially all of their domestic non-cash assets, are subject to the liens and security interests of their prepetition secured lenders.  Accordingly, the Real Alloy Debtors are currently without sufficient liquidity with which to pay ongoing expenses necessary to operate their business and administer the Chapter 11 Cases.  The Real Alloy Debtors' immediate access to the proposed DIP Facilities will preserve and maximize the value of the Real Alloy business, and avoid immediate and irreparable harm to the Real Alloy Debtors' estates and creditors.

2.      Over the course of the past year, the Real Alloy Debtors have engaged in a concerted effort to raise operational liquidity.  Beginning in July 2017, the Real Alloy Debtors and their investment banker, Jefferies LLC ("Jefferies"), formulated and launched a campaign to

---

[2] In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Michael J. Hobey in Support of Chapter 11 Petitions and Requests for First Day Relief* (the "First Day Declaration") and the *Declaration of Robert White in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (II) Authorizing Postpetition Use of Cash Collateral and Other Prepetition Collateral, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b), and (V) Granting Related Relief* (the "White Declaration," attached hereto as **Exhibit D**), each filed with the Court concurrently herewith.

refinance their Senior Secured Notes (as defined herein).  As part of the marketing process for the refinancing, Jefferies contacted in excess of 130 potential investors, which resulted in three proposals, each highly contingent and subject to extensive and time-consuming diligence.  In October 2017, the Real Alloy Debtors' liquidity began to deteriorate as a result of the withdrawal of trade credit insurance coverage for certain of the Real Alloy Debtors' suppliers and vendors.  In addition, the Real Alloy Debtors expected that the release of their third quarter results would lead to a further liquidity contraction.  In response, the Real Alloy Debtors and Jefferies contacted their prepetition secured lenders to discuss potential strategic alternatives in light of their liquidity situation.  At the same time and due to these increasing liquidity challenges, the Real Alloy Debtors and Jefferies began planning for a possible chapter 11 filing.  As part of those preparations, the Real Alloy Debtors and Jefferies contacted a wide range of lenders and requested proposals for debtor-in-possession financing to fund a restructuring or sale under chapter 11 of the Bankruptcy Code.

3.      As a result of extensive arm's-length negotiations, the Real Alloy Debtors' prepetition secured lenders have agreed and consented to provide the Real Alloy Debtors with the DIP Facilities and to permit the Real Alloy Debtors to use their cash collateral and other prepetition collateral during the interim postpetition period pursuant to the terms of the DIP Documents and the Interim Order, pending a Final Hearing.  The proposed DIP Facilities consist of a senior secured debtor-in-possession revolving credit facility in the amount of $110 million provided by Bank of America, the Real Alloy Debtors' prepetition ABL lender, and an agreement for issuance and purchase of up to $255 million in senior secured debtor-in-possession notes backstopped by the largest prepetition holder of the Real Alloy Debtors' prepetition Senior Secured Notes (including up to $85 million in new liquidity).  The Real Alloy

ny-1305305
670646.1 11/17/2017

Debtors' immediate access to the incremental liquidity provided by the proposed DIP Facilities will preserve and maximize the value of the Real Alloy business, and avoid immediate and irreparable harm to the Real Alloy Debtors' estates and creditors.  Moreover, these financial accommodations have enabled the Real Alloy Debtors to commence, and should allow the Real Alloy Debtors to continue to administer in an orderly fashion, their Chapter 11 Cases, while exploring a potential sale of the Real Alloy business.

4.      The Real Alloy Debtors believe that the DIP Facilities represent the best financing option available to them under the circumstances.  The Real Alloy Debtors were unable to obtain alternative postpetition financing proposals from other lenders through credit allowable as an administrative expense or secured by liens on the Real Alloy Debtors' assets that are junior to the liens of the Prepetition Secured Parties, or on otherwise better terms than those provided by the proposed DIP lenders—particularly in light of the disruption and risks associated with attempting to obtain approval of a financing that would prime the Prepetition Secured Parties.

5.      For these reasons, and for the reasons set forth below, the Debtors believe that authorizing the Real Alloy Debtors to obtain the DIP Facilities is vital, will avoid immediate and irreparable harm to and maximize the value of the Real Alloy Debtors' estates, and is a sound exercise of the Real Alloy Debtors' business judgment.  Accordingly, the Debtors respectfully request that Court grant the Motion on an interim and final basis.

## JURISDICTION AND VENUE

6.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-l(f) to

4

the entry of a final order by the Court in connection with this Motion to the extent that it is later

determined that the Court, absent consent of the parties, cannot enter final orders or judgments in

connection herewith consistent with Article III of the United States Constitution.

7.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory and procedural bases for the relief requested herein are sections 105,

361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004,

and 9014, and Local Rules 2002-1(b), 4001-1, 4001-2, and 9013-1.

## **RELIEF REQUESTED**

By this Motion, the Real Alloy Debtors seek entry of an interim order (the "Interim

Order"), substantially in the form attached hereto as **Exhibit A**, and a final order (the "Final

Order,"[3] and together with the Interim Order, the "DIP Orders"), pursuant to sections 105, 361,

362, 363, 364, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules

2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), and rules 2002-1(b), 4001-1, 4001-2, and 9013-1 of the Local Rules of Bankruptcy

Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the

"Local Rules"):

(a)      authorizing Real Alloy Holding, Inc. (the "DIP Notes Issuer") to issue, and Real
Alloy Intermediate Holding, Inc. ("Intermediate Holding") and the other
guarantors (including Intermediate Holding and all of the other Debtors other than
the DIP Notes Issuer and Real Industry, Inc., collectively, the "DIP Notes
Guarantors," and together with the DIP Notes Issuer, the "DIP Debtors") under
the DIP Notes Documents (as defined herein) to unconditionally guaranty, jointly
and severally, the DIP Notes Issuer's obligations in respect of senior secured
priming and superpriority postpetition notes (the "New Money DIP Notes"), in an
aggregate principal amount not to exceed $85,000,000 (the "Total Aggregate New
Money DIP Notes Commitment") comprised of (A) $65,000,000 of New Money
DIP Notes, the proceeds of which shall be used exclusively to fund the operations
of the Debtors (the "Debtor DIP Notes Facility"), except as expressly set forth in
the Interim Order, and (B) an amount of New Money DIP Notes determined by

---

[3]  The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

the Required DIP Noteholders in their sole discretion, up to $20,000,000, the proceeds of which shall be used exclusively to fund the operations of the Debtors' foreign subsidiaries (the "Discretionary Foreign Subsidiary DIP Notes Facility," and together with the Debtor DIP Notes Facility, the "DIP Notes Facility," and together with the DIP ABL Facility (as defined herein), the "DIP Facilities") pursuant to the terms of (x) the Interim Order, (y) that certain [Notes Purchase Agreement], dated as of November [__], 2017 (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "DIP Notes Purchase Agreement"), by and among the DIP Notes Issuer, the DIP Notes Guarantors, the financial institutions party to the DIP Notes Purchase Agreement as "Purchasers" under, and as defined in, the DIP Notes Purchase Agreement (the holders of the New Money DIP Notes from time to time, collectively, the "DIP Noteholders," and together with the entity(ies) designated by the Required DIP Noteholders (as defined herein) to act as (i) trustee or agent for the DIP Notes (who shall be (a) designated by the Required DIP Noteholders before the Final Hearing (as defined below) in connection with the New Money DIP Notes) and (b) the trustee under the Prepetition Notes Indenture in connection with the Roll Up DIP Notes), in such capacity and, in the case of the foregoing clause (a) solely to the extent appointed, the "DIP Notes Trustee," and (ii) collateral trustee for the DIP Notes (the "DIP Collateral Trustee," and any other party to which DIP Notes Obligations (as defined herein) are owed, the "DIP Notes Secured Parties"), in substantially the form attached hereto as Exhibit B, and (z) any and all other "Notes Purchase Documents" (as defined in the DIP Notes Purchase Agreement, and together with any and all documents related thereto, the "New Money DIP Notes Documents");

(b)     authorizing the DIP Notes Issuer to issue and the DIP Notes Guarantors to unconditionally guaranty, jointly and severally, the DIP Notes Issuer's obligations in respect of, subject to entry of the Final Order, the Roll Up DIP Notes (as defined herein) pursuant to (x) the Final Order, (y) that certain Supplemental Indenture supplementing and amending the Prepetition Notes Indenture (the "Roll Up DIP Notes Supplemental Indenture," which shall be filed prior to the Final Hearing), and (z) any and all other "Notes Documents" (as defined in the Prepetition Notes Indenture, and together with any and all security and other documents related thereto and necessary or expedient to effectuate the rollup of the Prepetition Notes, the "Roll Up DIP Facility Documents" and together with the New Money DIP Notes Documents, the "DIP Notes Documents"), to: (A) fund, among other things, ongoing working capital, general corporate expenditures, and other financing needs of the Debtors, (B) subject to entry of a Final Order (as defined herein), exchange the Prepetition Notes (as defined herein) held by the DIP Noteholders for "Roll-up Notes" (as defined in the Roll Up DIP Notes Supplemental Indenture, the "Roll Up DIP Notes," together with the New Money DIP Notes, the "DIP Notes," the DIP Noteholders who hold such Roll Up Notes together with the DIP Collateral Trustee and the DIP Notes Trustee, in each case, as trustee for such holders of the Roll Up Notes, the "Roll Up DIP Notes Secured Parties" and collectively with the New Money DIP Secured Parties, the "DIP Notes Secured Parties"), as provided in such Final

6

Order and the Roll Up DIP Facility Documents, (C) pay certain adequate protection amounts to the Prepetition Notes Secured Parties (as defined herein) as described below, (D) pay certain transaction fees and other costs and expenses of administration of the Chapter 11 Cases, and (E) pay fees and expenses (including reasonable attorneys' fees and expenses) and interest owed to the DIP Notes Secured Parties under the DIP Notes Documents and the Interim Order;

(c)     approving the terms of, authorizing the Debtors to execute and deliver, and perform under, the DIP Notes Documents and authorizing and directing the Debtors to perform such other and further acts as may be required in connection with the DIP Notes Documents and the Interim Order;

(d)     granting (x) to the DIP Collateral Trustee, for the benefit of itself and the other DIP Notes Secured Parties, Liens on all of the DIP Collateral (as defined herein) pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, which Liens shall be (A) as to the DIP ABL Priority Collateral,[4] junior solely to the Carve-Out (as defined below), any Liens in favor of the DIP ABL Secured Parties (as defined below), the Liens in favor of the Prepetition ABL Secured Parties (as defined below), and any Liens that are (1) in existence on the Petition Date (as defined below), (2) either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, and (3) permitted under the Prepetition Notes Documents and the Prepetition ABL Documents and senior in priority to the Liens in favor of Prepetition Notes Secured Parties and the Prepetition ABL Secured Parties (together, the "Prepetition Secured Parties") after giving effect to any intercreditor or subordination agreement (such Liens described in clauses (1)-(3) above, the "Prepetition Prior ABL Priority Collateral Liens"), (B) as to the DIP Notes

---

[4] "DIP ABL Priority Collateral" shall have the meaning given to the term "North America ABL Priority Collateral" under the Intercreditor Agreement (as defined herein), as such term is amended pursuant to the following sentences. Clause (ii) of the term "North America ABL Priority Collateral" set forth in the Intercreditor Agreement is hereby amended and restated as the following: "Deposit Accounts, Securities Accounts and commodity accounts (and all cash, checks and other negotiable instruments, funds, securities, commodity contracts and other evidences of payment or other assets held therein) (but in any event, excluding any Deposit Account or Securities Account used exclusively for identifiable proceeds of Notes Priority Collateral)." Clause (viii) of the term "North America ABL Priority Collateral" set forth in the Prepetition Intercreditor Agreement is hereby amended and restated as the following: "(viii) all proceeds and products of any or all of the foregoing in whatever form received, but excluding any property that is directly acquired prior to the termination of the commitments under the DIP ABL Facility and acceleration of the DIP ABL Obligations or the DIP Notes Purchase Agreement and the acceleration of the DIP Notes Obligations with cash proceeds of any North America ABL Priority Collateral and does not otherwise constitute North America ABL Priority Collateral upon its acquisition; provided that capitalized terms used in this clause (viii) but not otherwise defined in this Agreement shall have the meanings ascribed to such terms in the interim order approving debtor-in-possession financing from certain of the Claimholders entered in the chapter 11 cases of Holdings, the Company, and the Grantors commenced on November 17, 2017."

Priority Collateral[5] and the Proceeds Account (as defined below) senior to the Liens in favor of the Prepetition Notes Secured Parties, the Prepetition ABL Secured Parties, and the DIP ABL Secured Parties and all other Liens and interests, but junior to the Carve-Out and any Liens that are (1) in existence on the Petition Date (as defined below), (2) either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, and (3) permitted under the Prepetition Notes Documents and the Prepetition ABL Documents and senior in priority to the Liens in favor of Prepetition Notes Secured Parties and the Prepetition ABL Secured Parties after giving effect to any intercreditor or subordination agreement (the Liens described in clauses (1)-(3) above, the "Prepetition Prior Notes Priority Collateral Liens," and together with the Permitted DIP ABL Priority Collateral Liens, collectively, the "Prepetition Prior Liens"), and (c) as to the New DIP Collateral, senior to the Liens in favor of the Prepetition Notes Secured Parties and the Prepetition ABL Secured Parties, *pari passu* with the Liens of the DIP ABL Secured Parties, and junior to the Prepetition Prior Liens, and (y) to the DIP Notes Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative claims (on a *pari passu* basis with such claim herein granted to the DIP ABL Secured Parties) having recourse to all prepetition and postpetition property of the DIP Debtors' estates, now owned or hereafter acquired and the proceeds of each of the foregoing, including,[6] upon entry of the Interim Order, any DIP Debtor's rights under section 549 of the Bankruptcy Code and the proceeds thereof, and upon entry of the Final Order, and the proceeds of Avoidance Actions (as defined below);

(e)     authorizing the Debtors designated as "Borrowers" under, and as defined in, the DIP ABL Credit Agreement (as defined below) (collectively, the "DIP ABL Borrowers") to obtain, and the Debtors designated as "Guarantors" (the "DIP ABL Guarantors") under the DIP ABL Documents (as defined below) to unconditionally guaranty, jointly and severally, the Borrowers' obligations in respect of, senior secured priming and superpriority postpetition financing, consisting of a revolving credit facility for up to $110,000,000 (the "DIP ABL

---

[5] "DIP Notes Priority Collateral" shall have the meaning given to the term "Notes Priority Collateral" under the Prepetition Intercreditor Agreement, as such term is amended pursuant to the following sentence. Clause (xi) of the term "Notes Priority Collateral" set forth in the Intercreditor Agreement is hereby amended and restated as the following: "(xi) all proceeds and products of any or all of the foregoing in whatever form received, but excluding any property that is directly acquired prior to the termination of the commitments under the DIP ABL Facility and acceleration of the DIP ABL Obligations or the DIP Notes Purchase Agreement and the acceleration of the DIP Notes Obligations with cash proceeds of any Notes Priority Collateral and does not otherwise constitute Notes Priority Collateral upon its acquisition; provided that capitalized terms used in this clause (xi) but not otherwise defined in this Agreement shall have the meanings ascribed to such terms in the interim order approving debtor-in-possession financing from certain of the Claimholders entered in the chapter 11 cases of Holdings, the Company, and the Grantors commenced on November 17, 2017"

[6] As used herein, the words "including" or "include" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation."

<u>Facility</u>," and all loans extended under the DIP ABL Facility, including the Roll Up DIP ABL Loans (as defined herein), the "<u>DIP ABL Loans</u>"), including a letter of credit sub-facility for up to $25,000,000 (the "<u>DIP LC Facility</u>," and all obligations thereunder, together with obligations under the DIP ABL Facility, including the Roll Up DIP ABL Loans, the "<u>DIP ABL Obligations</u>," and collectively with the DIP Notes Obligations, the "<u>DIP Obligations</u>"), pursuant to the terms of (x) the Interim Order, (y) that certain debtor-in-possession credit agreement, dated as of the date of entry of the Interim Order (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "<u>DIP ABL Credit Agreement</u>"), by and among the Borrowers, the DIP ABL Guarantors, Bank of America, N.A., as administrative agent and collateral agent (in such capacity, and as administrative agent and collateral agent under the Roll Up DIP ABL Facility (as defined herein), collectively, the "<u>DIP ABL Agent</u>"), and the other financial institutions party to the DIP ABL Credit Agreement as "Lenders" under, and as defined in, the DIP ABL Credit Agreement (together with the Roll Up DIP ABL Lenders (as defined below), collectively, the "<u>DIP ABL Lenders</u>," and together with the DIP ABL Agent and any other party to which DIP ABL Obligations (as defined below) are owed, the "<u>DIP ABL Secured Parties</u>," and collectively with the DIP Notes Secured Parties, the "<u>DIP Secured Parties</u>"), and (z) any and all other "Loan Documents" (as defined in the DIP ABL Credit Agreement, and together with the DIP ABL Credit Agreement, collectively, the "<u>DIP ABL Loan Documents</u>," and collectively with the DIP Notes Documents, the "<u>DIP Documents</u>"), to: (A) fund, among other things, ongoing working capital, general corporate expenditures and other financing needs of the Debtors, (B) provide letters of credit for the account of any of the Debtors, (C) upon entry of the Interim Order, use proceeds of DIP ABL Priority Collateral to repay Prepetition ABL Obligations (as defined below) in accordance with the terms of the Prepetition ABL Credit Agreement and to deem all letters of credit issued under the Prepetition ABL Credit Agreement to letters of credit issued under the DIP LC Facility, (D) subject to entry of the Final Order, repay all remaining Prepetition ABL Obligations held by each DIP ABL Lender (such repaid Prepetition ABL Obligations, the "<u>Roll Up DIP ABL Loans</u>"), (E) pay certain adequate protection amounts to the Prepetition ABL Secured Parties as described below, (F) pay certain transaction fees and other costs and expenses of administration of the Chapter 11 Cases, and (G) pay fees and expenses (including reasonable attorneys' fees and expenses) and interest owed to the DIP ABL Secured Parties under the DIP ABL Loan Documents and the Interim Order;

(f)    granting (i) to the DIP ABL Agent, for the benefit of itself and the other DIP ABL Secured Parties, Liens on all of the DIP Collateral pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, which Liens shall be (A) as to the DIP Notes Priority Collateral, junior solely to any Liens of the DIP Notes Secured Parties, to the Carve-Out, to any valid, enforceable, and non-avoidable Liens in favor of the Prepetition Notes Secured Parties (as defined herein), and to any Prepetition Prior Liens, (B) as to the DIP ABL Priority Collateral, senior to all other liens and interests other than any Prepetition Prior Liens, (C) as to the New

9

DIP Collateral, senior to the Liens in favor of the Prepetition Notes Secured Parties and the Prepetition ABL Secured Parties, but *pari passu* with the Liens of the DIP Notes Secured Parties, and junior to the Prepetition Prior Liens; and (ii) to the DIP ABL Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative claims having recourse to all prepetition and postpetition property of the DIP Debtors' estates, now owned or hereafter acquired and the proceeds of each of the foregoing, including, upon entry of the Interim Order, any DIP Debtors' rights under section 549 of the Bankruptcy Code and the proceeds thereof, and upon entry of the Final Order, proceeds of Avoidance Actions (as defined below);

(g)     approving the terms of, and authorizing the Debtors to execute and deliver, and perform under, the DIP ABL Loan Documents and authorizing and directing the Debtors to perform such other and further acts as may be required in connection with the DIP ABL Loan Documents and the Interim Order;

(h)     authorizing the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), including Cash Collateral in which any or all of the Prepetition Secured Parties (as defined herein), the DIP Notes Secured Parties, and/or the DIP ABL Secured Parties have a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to the Interim Order, or otherwise;

(i)     vacating the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order;

(j)     authorizing (i) the DIP Notes Issuer at any time prior to the earlier of (A) thirty five (35) calendar days after the Petition Date and (B) the entry of the Final Order to issue DIP Notes in an aggregate outstanding principal amount that will not exceed $40,000,000 under the Debtor DIP Notes Facility and $10,000,000 under the Discretionary Foreign Subsidiary DIP Notes Facility authorizing the DIP Notes Guarantors to unconditionally guaranty such obligations jointly and severally, (ii) upon entry of the Final Order, the remainder of the DIP Notes Facilities, (iii) the DIP ABL Borrowers at any time prior to the earlier of (A) thirty five (35) calendar days after the Petition Date and (B) the entry of the Final Order to borrow under the DIP ABL Facility in an aggregate outstanding principal amount that will not exceed the sum of (x) $20,000,000 plus (y) the aggregate amount of all prepetition letters of credit deemed letters of credit under the DIP ABL Loan Documents, plus (c) the aggregate amount of all Prepetition ABL Obligations repaid from the proceeds of DIP ABL Priority Collateral during the Interim Period (as defined below), and authorizing the DIP ABL Guarantors to unconditionally guaranty such obligations jointly and severally, and (iv) upon entry of the Final Order, the remainder of the DIP ABL Facility;

(k)     granting the Prepetition Secured Parties, as of the Petition Date and in accordance with the relative priorities set forth herein, the Prepetition Adequate Protection (as

defined herein), which consists of, among other things, the Prepetition Adequate Protection Liens (as defined herein), the Prepetition Adequate Protection Superpriority Claims (as defined herein), and certain periodic payments;

(l)     scheduling a final hearing on the DIP Motion (the "Final Hearing") to be held no later than December 22, 2017, to consider entry of a final order that grants all of the relief requested in the DIP Motion on a final basis and which final order shall be in form and substance (including with respect to any subsequent modifications to the form or substance made in response to objections of other creditors[7] or this Court) acceptable to the "Required Holders" (as defined in the DIP Notes Purchase Agreement, the "Required DIP Noteholders") and the DIP ABL Agent, each in their respective sole discretion (the "Final Order");

(m)    waving, upon entry of the Final Order, certain rights of the Debtors to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code and to assert the "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(n)    providing for the immediate effectiveness of the Interim Order and waives any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness; and

(o)    granting related relief.

**Concise Statements Pursuant to Bankruptcy Rule 4001(b)-(c) and Local Rule 4001-2**

9.     The chart below contains a summary of the material terms of the proposed DIP Facilities, together with references to the applicable sections of the term sheet for the DIP ABL Facility (the "DIP ABL Term Sheet," attached hereto as **Exhibit B**), the term sheet for the Notes ABL Facility (the "DIP Notes Term Sheet," attached hereto as **Exhibit C**), and the Interim Order, as applicable, as required by Bankruptcy Rules 4001 (b)(1)(B) and 4001 (c)(1)(B), and consistent with Local Rule 4001-2.[8]

---

[7] Nothing herein permits a creditor to file any objection prohibited by the Prepetition Intercreditor Agreement (as defined herein).

[8] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Notes Purchase Agreement, the Roll Up DIP Notes Supplemental Indenture, the DIP ABL Credit Agreement, and the Interim Order. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the respective DIP Documents or the Interim Order, as applicable.

| Bankruptcy Code | DIP Facilities |
|---|---|
| **DIP Notes Issuer**<br>Bankruptcy Rule 4001(c)(1)(B) | Real Alloy Holding, Inc.<br><br>*See* Interim Order § 2(c). |
| **DIP Notes Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Real Alloy Intermediate Holding, LLC<br>Real Alloy Holding, Inc.<br>Real Alloy Recycling, Inc.<br>Real Alloy Bens Run, LLC<br>Real Alloy Specialty Products, Inc.<br>Real Alloy Specification, Inc.<br>ETS Schaefer, LLC<br>RA Mexico Holding, LLC<br><br>*See* Interim Order § 2(c). |
| **DIP Notes Backstop**<br>Bankruptcy Rule 4001(c)(1)(B) | Funds and/or accounts affiliated with, or managed and/or advised by, DDJ Capital Management, LLC, and the other Prepetition Noteholders (or their affiliates) so identified in the DIP Notes Purchase Agreement (together with their respective successors and permitted assignees, each a "<u>Backstop Party</u>" and collectively, the "<u>Backstop Parties</u>") will, severally and not jointly, backstop the New Money DIP Notes in the amounts set forth in the DIP Notes Documents.<br><br>*See* Interim Order § 2(d). |
| **DIP Notes**<br>Bankruptcy Rule 4001(c)(1)(B) | **New Money DIP Notes**: Senior secured priming and superpriority postpetition notes, in an aggregate principal amount not to exceed $85,000,000 comprised of (A) $65,000,000 of New Money DIP Notes, the proceeds of which shall be used exclusively to fund the operations of the Debtors, and (B) an amount of New Money DIP Notes determined by the Required DIP Noteholders in their sole discretion, up to $20,000,000, the proceeds of which shall be used exclusively to fund the operations of the Debtors' foreign subsidiaries.<br><br>**Roll Up DIP Notes**:  $170,000,000 of Roll Up DIP Notes (as defined below), the proceeds of which shall be used to exchange the Prepetition Notes (as defined below) held by the DIP Noteholders for "Roll-up Notes" (as defined in the Roll Up DIP Notes Supplemental Indenture, the "<u>Roll Up DIP Notes</u>").<br><br>*See* Interim Order Preamble. |
| **DIP ABL Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Real Alloy Holding, Inc.<br>Real Alloy Recycling, Inc.<br>Real Alloy Specialty Products, Inc.<br>Real Alloy Specification, Inc.<br>EST Schaefer, LLC<br><br>*See* Interim Order Preamble. |
| **DIP ABL Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | All guarantors under the Existing Revolving Facility and Real Alloy Canada Ltd.<br><br>*See* DIP ABL Term Sheet pg. A-1. |

12

| Bankruptcy Code | DIP Facilities |
|---|---|
| **DIP ABL Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Bank of America, N.A. ("BANA") and such other Lenders acceptable to BANA (if any) would be the "DIP Revolving Lenders."<br><br>*See* DIP ABL Term Sheet pg. A-1. |
| **DIP ABL Facility Commitment**<br>Bankruptcy Rule 4001(c)(1)(B) | $110,000,000 (with $20,000,000 available upon entry of the Interim Order)<br><br>*See* Interim Order § 2(d). |
| **Interest Rates**<br>Bankruptcy Rule 4001 (c)(1)(B) | **DIP Notes Facility**<br><br>New Money DIP Notes: 11.5%.  From and after the occurrence and during the continuance of an Event of Default, additional interest shall accrue at a rate of 2%.  Interest on the New Money DIP Loans shall be paid monthly.<br><br>Roll-Up DIP Notes: same as Prepetition Notes; provided that interest accruing on the Roll-Up Notes shall be payable upon the Termination Date.<br><br>*See* DIP Notes Term Sheet pg. 7.<br><br>**DIP ABL Facility.**<br><br>Borrower may elect that the loans bear interest at a rate per annum equal to: (i) the Base Rate plus the Applicable Margin, or (ii) One-Year LIBOR plus the Applicable Margin.<br><br>"Base Rate" means, for any day, a per annum rate equal to the greater of (a) the Prime Rate for such day; (b) the Federal Funds Rate for such day, plus 0.50% per annum; or (c) LIBOR for a 30 day interest period as of such day; provided that in no event shall the Base Rate be less than zero.<br><br>"Applicable Margin" means (i) 2.25% in the case of Base Rate Loans and (ii) 3.25% in the case of LIBOR Rate Loans.<br><br>*See* DIP ABL Term Sheet Annex A-I |
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Notes Facility and DIP ABL Facility shall require delivery of all reports and notices substantially similar to those set forth in the Prepetition Notes Documents and the Prepetition ABL Documents, respectively.<br><br>*See* DIP Notes Term Sheet pg. 19; DIP ABL Term Sheet pg. A-9, A-10. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(i) | Prepetition ABL Secured Parties and Prepetition Notes Secured Parties.<br><br>*See* Interim Order § 3-4. |
| **Maturity Date**<br>Bankruptcy Rule 4001(b)(1)(B)(iii), 4001(c)(1)(B) | The earlier to occur of (a) the date that is six (6) months after the commencement of the Chapter 11 Cases, subject to extension with the consent of the DIP Debtors, the DIP Trustees, and the Required DIP Noteholders, (b) the consummation of the Sale (as defined below), and (c) an Event of Default.<br><br>*See* DIP Notes Term Sheet pg. 8; DIP ABL Term Sheet pg. A-4. |

| | |
|---|---|
| **Adequate Protection**<br>Bankruptcy Rules<br>4001 (b)(1)(B)(iv),<br>4001(c)(1)(B)(ii) | **Adequate Protection Liens**.  Subject to the terms and conditions set forth in the Interim Order, including the Carve-Out, replacement Liens upon all of the DIP Collateral, including, subject to the entry of the Final Order, proceeds of Avoidance Actions.<br><br>**Adequate Protection Superpriority Claims**.  Allowed superpriority administrative claims with priority over all administrative expense claims and priority and other unsecured claims against the DIP Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, which shall be (i) junior to the DIP Superiority Claims (and, in the case of the Prepetition Notes Adequate Protection Superpriority Claims, junior to the Carve-Out) and (ii) pari passu with the all other Adequate Protection Superpriority Claims (as defined herein), and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof and, subject to the entry of the Final Order, proceeds of Avoidance Actions; *provided*, *however*, that the Prepetition Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the Adequate Protection Superpriority Claims unless and until all DIP Obligations have been indefeasibly paid in full in cash.<br><br>**Interest and Professional Fees**.<br><br>Prepetition Notes Collateral Trustee: (a) the Real Alloy Debtors shall pay or reimburse in cash all fees, costs, expenses, and charges to the extent, and at the times, payable under the Prepetition Notes Documents, whether or not budgeted in the Approved Budget, and (b) post-petition interest on account of the Prepetition Notes Obligations shall accrue (but not be paid) at the non-default rate to the extent permitted pursuant to Section 506(b) of the Bankruptcy Code; provided that for avoidance of doubt, all accrued postpetition interest on account of any Prepetition Notes Obligations that are converted to Roll Up DIP Notes Obligations shall accrue from the Petition Date at the same rate applicable to the other DIP Notes Obligations and shall be payable upon the occurrence of a Termination Event.<br><br>Prepetition ABL Collateral Trustee: the Real Alloy Debtors shall (a) pay or reimburse in cash all fees, costs, expenses, and charges to the extent, and at the times, payable under the Prepetition ABL Agreement, whether or not budgeted in the Approved Budget, and (b) pay interest on the Prepetition ABL Obligations at the non-default rate under the Prepetition ABL Agreement on a current basis.<br><br>*See* Interim Order ¶¶ 3-4. |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule<br>4001 (c)(1)(B)(iv) | The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of the Interim Order and the DIP Documents as necessary to (i) permit the Debtors to grant the Prepetition Adequate Protection Liens and the DIP Liens and to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition Secured Parties under the DIP Documents and the Interim Order, (ii) authorize the DIP Secured Parties and the Prepetition Secured Parties to retain and apply payments made in accordance with the DIP Documents, the Prepetition Notes Documents, the Prepetition ABL Documents, and/or the Interim Order, (iii) to permit each of the DIP Secured Parties or the Prepetition Secured Parties to perform any act authorized under the Interim Order and the DIP Documents, and (iv) otherwise to the extent necessary to implement and effectuate the provisions of the Interim Order and the DIP Documents.<br><br>*See* Interim Order ¶ 15(g). |

| | |
|---|---|
| **Carve-Out**<br>Bankruptcy Rule<br>4001(c)(1)(B); | <u>**Carve-Out**</u>. Subject to the terms and conditions contained in this Paragraph 7, each of the DIP Notes Liens, the DIP Superpriority Claims in respect of the DIP Notes Obligations, the DIP ABL Liens on all DIP Collateral other than DIP ABL Priority Collateral, the Prepetition Notes Liens, the Prepetition Notes Adequate Protection Liens, and the Prepetition Notes Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve-Out in accordance with the terms of the Interim Order:<br><br>(a) <u>Carve-Out</u>. For purposes of the Interim Order, "Carve-Out" means (i) all unpaid fees required to be paid in these Cases to the clerk of the Bankruptcy Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a)(6); (ii) up to $50,000 for the fees, costs and expenses incurred by any Chapter 7 trustee appointed or elected in any Successor Case under Chapter 7 of the Bankruptcy Code; (iii) subject to the terms and conditions of the Interim Order, all unpaid fees, costs, and disbursements of professionals retained by the Debtors in these Cases (collectively, the "<u>Debtors' Professionals</u>") that are incurred prior to the delivery by the Required DIP Noteholders, the DIP Collateral Trustee, or the DIP Notes Trustee of a Carve-Out Trigger Notice (as defined below) and are allowed by this Court under sections 327, 330, or 363 of the Bankruptcy Code and remain unpaid after application of any retainers being held by such professionals; (iv) subject to the terms and conditions of the Interim Order, the unpaid fees, costs, and disbursements of professionals retained by the Committee in these Cases (collectively, the "<u>Committee's Professionals</u>"), in each case that are incurred prior to the delivery by the Required DIP Noteholders, the DIP Collateral Trustee, or the DIP Notes Trustee of a Carve-Out Trigger Notice and are allowed by this Court under sections 327, 330, or 363 of the Bankruptcy Code and remain unpaid after application of any retainers being held by such professionals; and (v) the reasonable unpaid fees, costs, and disbursements of the Debtors' Professionals and the Committee's Professionals that are incurred after the delivery of a Carve-Out Trigger Notice by the Required DIP Noteholders that are allowed by this Court under sections 327, 330, or 363 of the Bankruptcy Code after application of any retainers being held by such professionals, in an aggregate amount not to exceed $2,000,000 (the "<u>Post-Default Carve-Out Cap</u>"); provided that the terms "<u>Carve-Out</u>" and "<u>Post-Default Carve-Out Cap</u>" shall not include any success fee, financing fee, restructuring fee, transaction fee, or similar fee payable to any of the Debtors' Professional or Committee's Professionals. The term "<u>Carve-Out Trigger Notice</u>" shall mean a written notice delivered by the Required DIP Noteholders, the DIP Collateral Trustee, or the DIP Notes Trustee to the Debtors' lead counsel, the United States Trustee, and lead counsel to any Committee appointed in these Cases, which notice may be delivered at any time following the occurrence and during the continuation of any Termination Event (as defined below), expressly stating that the Post-Default Carve-Out Cap is triggered. No amounts set forth in this subparagraph 7(a) with respect to the Post-Default Carve-Out Cap may be modified without the prior written consent of the Required DIP Noteholders.<br><br>(b) Notwithstanding anything to the contrary in the Interim Order, the DIP Notes Documents, or the DIP ABL Loan Documents, the delivery of a Carve-Out Trigger Notice or the maturity of the DIP Notes or termination of the DIP Notes Purchase Agreement (including as a result of the closing of a Sale as defined in the Sale/Chapter 11 Milestones (defined below)) shall be deemed an automatic and irrevocable "<u>Note Purchase Request</u>" by the Debtors in accordance with Section 2 of the DIP Notes Purchase Agreement in an amount equal to the Carve-Out, and each DIP Noteholder shall thereafter purchase additional New Money DIP Notes pay an amount equal to its Commitment Percentage (as defined in the |

DIP Notes Purchase Agreement) of the lesser of (x) such principal amount of the Carve-Out in accordance with Section 3 thereof in and (y) the remaining unfunded portion of its Commitment (as defined in the DIP Notes Purchase Agreement). The Debtors shall promptly deposit and hold such amounts in a segregated account in trust to pay such Carve-Out amount prior to any and all other claims, and any amounts remaining after payment in full of all professional fees and expenses covered by the Carve-Out shall be remitted to the DIP Collateral Trustee for application to the DIP Notes Obligations and/or Prepetition Notes Obligations in accordance with their respective priorities as set forth herein.

(c) <u>No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees</u>.  Neither the DIP Secured Parties nor the Prepetition Secured Parties shall be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Debtors' Professionals or the Committee's Professionals incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Other than as set forth in Paragraph 7(b) above, nothing in the Interim Order or otherwise shall be construed (i) to obligate any DIP Secured Party or any Prepetition Secured Party in any way to pay compensation to, or to reimburse expenses of, any of the Debtors' Professionals or the Committee's Professionals or to guarantee that the Debtors or their estates have sufficient funds to pay such compensation or reimbursement or (ii) to increase the Carve-Out if actual allowed fees and expenses of any of the Debtors' Professionals or the Committee's Professionals are higher in fact than the amounts in the Approved Budget or the Carve-Out Cap.  Notwithstanding any provision in this Paragraph 7 to the contrary, no portion of the Carve-Out, Cash Collateral, Prepetition Notes Collateral, Prepetition ABL Collateral, DIP Collateral, or proceeds of the DIP Notes or ABL DIP Loans shall be utilized for the payment of professional fees and disbursements to the extent restricted under Paragraph [16] of the Interim Order.  Nothing in the Interim Order shall be construed as consent to the retention of any of the Debtors' Professionals or the Committee's Professionals or the terms of their engagement (including the terms of their compensation) or to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Cases or any Successor Cases, or of any other person or entity, or shall affect the right of any DIP Secured Party or any Prepetition Secured Party to object to the retention or terms of engagement of any of the Debtors' Professionals or the Committee's Professionals or to the allowance and payment of any of their respective fees and expenses, and no such consent or waiver of right to object shall be implied from the inclusion in the Approved Budget of any such fees or expenses; provided, however, that the Required DIP Noteholders intend to consent to the Debtors' retention of Jefferies LLC pursuant to that certain engagement letter dated as of October 1, 2017, subject to the execution and delivery of an amendment thereto reflecting certain modifications to the terms thereof as previously agreed between Jefferies LLC and the Required DIP Noteholders on November 17, 2017.

(d) <u>Payment of Allowed Professional Fees and Expenses Prior to the Termination Declaration Date</u>.  Prior to the occurrence of the Termination Declaration Date, the Debtors shall be permitted to pay allowed fees and expenses of the Debtors' Professionals and the Committee's Professionals (to the extent the fees and expenses of the Debtors' Professionals and the Committee's Professionals were incurred in accordance with the Approved Budget), subject to the Interim Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any interim compensation procedures order entered by this Court.  The amounts paid prior to the delivery of a Carve-Out Trigger Notice shall not reduce the Post-Default Carve-Out Cap.

*See* Interim Order ¶ 7.

| | |
|---|---|
| **506(c) Waiver**<br>Bankruptcy Rule 4001 (c)(1)(B)(x)<br><br>Local Rule 4001-2(a)(i)(C) | Upon entry of the Interim Order in the case of the DIP Secured Parties, and subject to the entry of the Final Order solely in the case of the Prepetition Secured Parties, and as a further condition of (a) the DIP Notes and any obligation of the DIP Notes Secured Parties to purchase DIP Notes pursuant to the DIP Notes Documents (and the consent of the DIP Notes Secured Parties and the Prepetition Notes Secured Parties to the payment of the Carve-Out to the extent provided in the Interim Order), (b) the DIP ABL Loans and any obligation of the DIP ABL Lenders to make the DIP ABL Loans pursuant to the DIP ABL Documents, and (c) the Debtors' use of Cash Collateral pursuant to the Interim Order and a Final Order, (x) no costs or expenses of administration of the Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties and/or the Prepetition Secured Parties, the DIP Collateral, the Prepetition Collateral, or the Cash Collateral, in each case pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the Required DIP Noteholders, the DIP ABL Agent, the Prepetition Notes Trustee, and/or the Prepetition ABL Agent, as the case may be, (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties or the Prepetition Secured Parties, and (c) the exercise prior to the entry of the Final Order of any rights under section 506(c) of the Bankruptcy Code or otherwise to charge any costs or expense of administration of the Cases or any Successor Cases from or against the Prepetition Secured Parties or their Liens on or other interests in any or all of the DIP Collateral, the Prepetition Collateral, and the Cash Collateral shall not impair and shall be subject to, and junior to, the DIP Liens on and the DIP Secured Parties' other interests in the DIP Collateral, the Prepetition Collateral, and the Cash Collateral and the other DIP Protections accorded the DIP Secured Parties; provided, further, that upon entry of the Interim Order, in consideration of and subject to the terms of the Carve-Out, no fees or expenses of the Debtors' Professionals or any Committee's Professionals accrued or accruing through the entry of the Final Order shall be charged against or recovered from or against any or all of the DIP Secured Parties and/or the Prepetition Secured Parties, the DIP Collateral, the Prepetition Collateral, or the Cash Collateral, in each case pursuant to Section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the Required DIP Noteholders, the DIP ABL Agent, the Prepetition Notes Trustee, and/or the Prepetition ABL Agent, as the case may be.<br><br>*See* Interim Order ¶ 8. |
| **Section 552(b)**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(H) | The DIP Liens and the DIP Superpriority Claims shall not be subject to the "equities of the case" exception of section 552 of the Bankruptcy Code.  Subject to entry of the Final Order, the Prepetition Notes Adequate Protection Liens, the Prepetition Notes Adequate Protection Superpriority Claims, the Prepetition ABL Adequate Protection Liens, and the Prepetition ABL Adequate Protection Superpriority Claims shall not be subject to the "equities of the case" exception of section 552 of the Bankruptcy Code.<br><br>*See* Interim Order ¶¶ 2(r), 3(c), 4(c). |
| **Liens on Certain Claims or Causes of Action**<br>Bankruptcy Rule 4001 (c)(1)(B)(x)<br><br>Local Rule 4001-2(a)(i)(D) | Subject to entry of the Final Order, the DIP Notes Liens shall extend to the proceeds of Avoidance Actions.<br><br>*See* Interim Order ¶ 2(l)-(m). |

17

| | |
|---|---|
| **Milestones**<br>Bankruptcy Rule 4001 (c)(1)(B) | No later than ten (10) calendar days after the Petition Date, the Debtors shall file the Sale and Bid Procedures Motion.<br><br>No later than fourteen (14) calendar days after the Petition Date, the Debtors shall have selected and retained, subject to Bankruptcy Court approval, a chief restructuring officer reasonably acceptable to the Required DIP Noteholders and the DIP ABL Agent.<br><br>No later than thirty-five (35) calendar days after the Petition Date (subject to the Bankruptcy Court's calendar), the Bankruptcy Court shall have entered the Bidding Procedures Order<br><br>No later than seventy-five (75) calendar days after the Petition Date, the Debtors shall select the Stalking Horse Bid and obtain Bankruptcy Court approval of the Stalking Horse Bid and related bid protections, which shall be acceptable to the DIP Collateral Trustee and the Required DIP Noteholders in their respective sole discretion.<br><br>No later than one hundred and thirty (130) calendar days after the Petition Date, the Debtors shall conduct the Auction.<br><br>No later than one (1) calendar day after the Auction concludes, the Debtors shall declare a "successful bidder" and "back-up bidder" for the Sale.<br><br>No later than five (5) calendar days after the conclusion of the Auction, the Bankruptcy Court shall have approved the Sale and entered the Sale Order and the transactions contemplated thereby, in each case, in form and substance satisfactory to the Debtors, the DIP ABL Agent, the DIP Collateral Trustee, the DIP Notes Trustee, and the Required DIP Noteholders in their respective sole discretion; provided, that the Debtors and the DIP Noteholders shall negotiate in good faith regarding the terms of a wind-down of the Debtors after consummation of the Sale (it being understand that the foregoing proviso does not obligation any of the parties to reach agreement on the terms of a wind-down).<br><br>The Sale shall close no later than one hundred and sixty (160) calendar days after entry of the Petition Date, and the Prepetition ABL Obligations and the DIP ABL Obligations shall be indefeasibly paid in full in cash at the closing of such Sale in accordance with the DIP ABL Loan Documents.<br><br>*See* Interim Order ¶ 14(c). |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(1)(B)(xiii)<br><br>Local Rule 4001-2(a)(i)(B) | The Debtors' Stipulations shall be binding upon the Debtors and their estates in all circumstances upon entry of the Interim Order.  The Debtors' Stipulations shall be binding upon each other party in interest, including the Committee, except to the extent and only to the extent such Committee or any other party in interest (including any chapter 11 trustee) other than the Debtors (or if the Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), *first*, obtains standing to commence and commences, by (a) with respect to any Committee, the later of  sixty (60) calendar days after the formation of such Committee and seventy-five (75) calendar days after the Petition Date, and (b) with respect to other parties in interest, seventy-five (75) calendar days after the Petition Date (such time period established by clauses (a) and (b), as the same may be extended in accordance with this Paragraph 6, shall be referred to as the "<u>Challenge Period</u>," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "<u>Challenge Period Termination Date</u>"), (y) a contested matter, adversary proceeding, challenging or otherwise objecting to the |

| | |
|---|---|
| | admissions, stipulations, findings, or releases included in the Debtors' Stipulations, or (z) a contested matter, adversary proceeding against any or all of the Prepetition Secured Parties in connection with or related to the Prepetition Secured Obligations, or the actions or inactions of any of the Prepetition Secured Parties arising out of or related to the Prepetition Secured Obligations, the Prepetition Notes Documents, or the Prepetition ABL Documents (clauses (y) and (z) collectively, the "<u>Challenges</u>" and, each individually, a "<u>Challenge</u>"), and *second*, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed Challenge (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "<u>Successful Challenge</u>").  The Challenge Period may be extended only with the written consent of the Prepetition Notes Trustee and the Prepetition ABL Agent, each in its respective sole discretion. <br><br>*See* Interim Order ¶ 6. |
| **Use of Cash Collateral** Bankruptcy Rule 4001 (b)(1)(B)(ii) | The North America ABL Priority Collateral (as defined herein) that is Cash Collateral shall be used to: (A) fund, among other things, ongoing working capital, general corporate expenditures and other financing needs of the Debtors, (B) provide letters of credit for the account of any of the Debtors, (C) upon entry of the Interim Order, to repay Prepetition ABL Obligations (as defined below) in accordance with the terms of the Prepetition ABL Credit Agreement and to deem all letters of credit issued under the Prepetition ABL Credit Agreement to letters of credit issued under the DIP LC Facility, (D) subject to entry of the Final Order, repay all remaining Prepetition ABL Obligations held by each DIP ABL Lender with proceeds of DIP ABL Obligations incurred under the DIP ABL Loan Documents, (E) pay certain adequate protection amounts to the Prepetition ABL Secured Parties as described below, (F) pay certain transaction fees and other costs and expenses of administration of the Chapter 11 Cases, and (G) pay fees and expenses (including reasonable attorneys' fees and expenses) and interest owed to the DIP ABL Secured Parties under the DIP ABL Loan Documents and the Interim Order.   After repayment of all Prepetition ABL Obligations, all proceeds of DIP ABL Priority Collateral shall be applied to the DIP ABL Obligations in accordance with the DIP ABL Credit Agreement until paid in full thereunder. <br><br>*See* Interim Order Preamble. |
| **Stipulations to Prepetition Liens and Claims** Bankruptcy Rule 4001(c)(1)(B)(iii) <br><br>Local Rule 4001-2(a)(i)(B) | **Debtors' Stipulations Regarding the Prepetition Notes**. <br><br><u>Prepetition Notes</u>.  Pursuant to that certain Indenture, dated as of January 8, 2015 (as amended, restated, or otherwise modified from time to time, the "Prepetition Notes Indenture," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "<u>Note Documents</u>" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Notes Documents</u>"), among (a) SGH Escrow Corporation, as issuer, (b) Intermediate Holding and the other guarantors party thereto, as guarantors, and (c) Wilmington Trust, National Association, as trustee and collateral trustee (in such capacities, the "<u>Prepetition Notes Trustee</u>"), SGH Escrow Corporation, predecessor-in-interest to Real Alloy Holding, Inc., issued those certain 10.000% senior secured notes due 2019 (the "<u>Prepetition Notes</u>," and the holders thereof, the "<u>Prepetition Noteholders</u>," and collectively with the Prepetition Notes Trustee, the "<u>Prepetition Notes Secured Parties</u>").  All obligations of the Debtors arising under the Prepetition Notes Documents (including the "<u>Note Obligations</u>" as defined in the Prepetition Notes Indenture), including the Prepetition Notes, shall collectively be referred to herein as the "<u>Prepetition Notes Obligations</u>;" provided that this term shall include the Prepetition Notes Obligations that are converted to Roll Up DIP Obligations for purposes of Paragraph D and Paragraph E of the Interim Order, but shall exclude |

such Prepetition Notes Obligations for purposes of all other provisions of the Interim Order from and after the conversion of such Prepetition Notes Obligations into the Roll Up DIP Obligations.

Prepetition Notes Liens and Prepetition Notes Collateral. Pursuant to the Security Documents (as defined in the Prepetition Notes Indenture) (as such documents were amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Notes Collateral Documents"), by and among each of the Debtors party thereto (the "Notes Grantors") and the Prepetition Notes Trustee, as collateral trustee, each Notes Grantor granted to the Prepetition Notes Trustee, for the benefit of itself and the other Prepetition Notes Secured Parties, to secure the Prepetition Notes Obligations, a security interest in and continuing Lien (the "Prepetition Notes Liens") on substantially all of such Notes Grantor's assets and properties (which, for the avoidance of doubt, includes Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising, including a first-priority lien on the Notes Priority Collateral (as defined in the Intercreditor Agreement). All "Collateral" as defined in the Prepetition Notes Indenture granted or pledged by such Notes Grantors pursuant to any Prepetition Notes Collateral Document or any other Prepetition Notes Document shall collectively be referred to herein as the "Prepetition Notes Collateral." As of the Petition Date, (a) the Prepetition Notes Liens (I) are legal, valid, binding, enforceable, and perfected Liens, (II) were granted to, or for the benefit of, the Prepetition Notes Secured Parties for fair consideration and reasonably equivalent value, (III) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non bankruptcy law (except for the priming contemplated in the Interim Order), and (IV) are subject and subordinate only to (W) the DIP Notes Liens (as defined below), (X) the Carve-Out, (Y) as to the DIP ABL Priority Collateral, the Liens in favor of the DIP ABL Secured Parties and the Prepetition ABL Secured Parties to the extent provided by the Intercreditor Agreement, and (Z) any Prepetition Prior Liens, and (b) (I) the Prepetition Notes Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition Notes Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (II) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition Notes Obligations exist, (III) no portion of the Prepetition Notes Obligations or any payments made to any or all of the Prepetition Notes Secured Parties are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (IV) each of the Guarantees (as defined in the Prepetition Notes Indenture) shall continue in full force and effect to unconditionally guaranty the Prepetition Notes Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Notes Secured Parties to the Debtors pursuant to the terms of the Interim Order or the DIP Notes Documents. All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Notes Trustee and the other Prepetition Notes Secured Parties.

Amounts Owed under Prepetition Notes Documents. As of the Petition Date, the applicable Debtors owed the Prepetition Notes Secured Parties, pursuant to the Prepetition Notes Documents, without defense, counterclaim, reduction, or offset of any kind, in respect of the Prepetition Notes Obligations, an aggregate principal amount of not less than $305,000,000 of Prepetition Notes, plus all accrued and hereafter accruing and unpaid interest thereon and any additional fees, expenses (including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the

Prepetition Notes Documents), and other amounts now or hereafter due under the Prepetition Notes Documents.

Release of Claims.  Subject to the reservation of rights set forth in Paragraph 6 below, each Debtor and its estate shall be deemed to have forever waived, discharged, and released each of the Prepetition Notes Secured Parties and their respective affiliates, assigns, or successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees, and other representatives of the foregoing (all of the foregoing, collectively, the "Prepetition Notes Secured Party Releasees") from any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights, and other rights of disgorgement or recovery against any and all of the Prepetition Notes Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the Prepetition Notes Obligations, the Prepetition Notes Liens, or the debtor-creditor relationship between any of the Prepetition Notes Secured Parties, on the one hand, and any of the Debtors, on the other hand, including (a) any recharacterization, subordination, avoidance, disallowance, or other claim or assertion arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, or municipal law and (b) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition Notes Obligations or any payments or other transfers made on account of the Prepetition Notes Obligations, or the validity, enforceability, priority, or non-avoidability of the Prepetition Notes Liens securing the Prepetition Notes Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the Prepetition Notes Secured Party Releasees.

**Debtors' Stipulations Regarding Prepetition ABL Facility.**

Prepetition ABL Facility.  Pursuant to that certain Revolving Credit Agreement, dated as of March 14, 2017 (as amended or otherwise modified from time to time, the "Prepetition ABL Agreement," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Documents;" and the "Obligations" as defined in the Prepetition ABL Agreement, the "Prepetition ABL Obligations,"  and collectively with the Prepetition Notes Obligations, the "Prepetition Secured Obligations"),  among certain of the Debtors, as borrowers, the Borrower Representative (as defined therein), the other Credit Parties (as defined therein) party thereto, Bank of America, N.A., as administrative agent (the "Prepetition ABL Agent"), and the lenders party thereto (the "Prepetition ABL Lenders;" collectively with the Prepetition ABL Agent, the "Prepetition ABL Secured Parties;" and the Prepetition ABL Secured Parties collectively with the Prepetition Notes Secured Parties, the "Prepetition Secured Parties"), the Prepetition ABL Secured Parties agreed to extend loans and other financial accommodations to the Debtors on a secured basis (the liens and interests securing the Prepetition ABL Obligations, the "Prepetition ABL Liens").

Prepetition ABL Liens and Prepetition ABL Collateral.  Pursuant to the Security Documents (as defined in the Prepetition ABL Agreement) (as such documents were amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Collateral Documents"), by and among each of the Debtors party thereto (the "ABL Grantors") and the Prepetition ABL Agent, as collateral trustee, each ABL Grantor granted to the Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Secured Parties, to secure the Prepetition

21

ABL Obligations, a security interest in and continuing Lien (the "Prepetition ABL Liens," and together with the Prepetition Notes Liens, the "Prepetition Liens") on substantially all of such ABL Grantor's assets and properties (which, for the avoidance of doubt, includes Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising, including a first-priority lien on the North America ABL Priority Collateral (as defined in the Intercreditor Agreement). All "Collateral" as defined in the Prepetition ABL Agreement granted or pledged by such ABL Grantors pursuant to any Prepetition ABL Collateral Document or any other Prepetition ABL Document shall collectively be referred to herein as the "Prepetition ABL Collateral," and together with the Prepetition Notes Collateral, the "Prepetition Collateral." As of the Petition Date, (a) the Prepetition ABL Liens (I) are legal, valid, binding, enforceable, and perfected Liens, (II) were granted to, or for the benefit of, the Prepetition ABL Secured Parties for fair consideration and reasonably equivalent value, (III) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non bankruptcy law (except for the priming contemplated in the Interim Order), and (IV) are subject and subordinate only to (X) the DIP ABL Liens (as defined below), (Y) as to the DIP Notes Priority Collateral, the Liens in favor of the DIP Notes Secured Parties and the Prepetition Notes Secured Parties to the extent provided by the Intercreditor Agreement and the Carve-Out, and (Z) any Prepetition Prior Liens, and (b)(I) the Prepetition ABL Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition ABL Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (II) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition ABL Obligations exist, (III) no portion of the Prepetition ABL Obligations or any payments made to any or all of the Prepetition ABL Secured Parties are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (IV) each of the Guarantees (as defined in the Prepetition ABL Credit Agreement) shall continue in full force and effect to unconditionally guaranty the Prepetition ABL Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP ABL Secured Parties to the Debtors pursuant to the terms of the Interim Order or the DIP ABL Documents. All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition ABL Agent and the other Prepetition ABL Secured Parties.

Amounts Owed under Prepetition ABL Documents. As of the Petition Date, the applicable Debtors owed the Prepetition ABL Secured Parties, pursuant to the Prepetition ABL Documents, without defense, counterclaim, reduction, or offset of any kind, in respect of the Prepetition ABL Obligations, an aggregate principal amount of not less than $96,000,000 of Prepetition ABL Loans, plus all accrued and hereafter accruing and unpaid interest thereon and any additional fees, expenses (including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition ABL Documents), and other amounts now or hereafter due under the Prepetition ABL Documents.

Release of Claims. Subject to the reservation of rights set forth in Paragraph 6 below, each Debtor and its estate shall be deemed to have forever waived, discharged, and released each of the Prepetition ABL Secured Parties and their respective affiliates, assigns, or successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants,

| | |
|---|---|
| | officers, directors, employees, and other representatives of the foregoing (all of the foregoing, collectively, the "Prepetition ABL Secured Party Releasees") from any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights, and other rights of disgorgement or recovery against any and all of the Prepetition ABL Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the Prepetition ABL Obligations, the Prepetition ABL Liens, or the debtor-creditor relationship between any of the Prepetition ABL Secured Parties, on the one hand, and any of the Debtors, on the other hand, including (a) any recharacterization, subordination, avoidance, disallowance, or other claim or assertion arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, or municipal law and (b) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition ABL Obligations or any payments or other transfers made on account of the Prepetition ABL Obligations, or the validity, enforceability, priority, or non-avoidability of the Prepetition ABL Liens securing the Prepetition ABL Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the Prepetition ABL Secured Party Releasees.<br><br>*See* Interim Order ¶¶ D-E. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** Bankruptcy Rule 4001 (c)(1)(B)(vii) | The Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens and the Prepetition Adequate Protection Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document that may otherwise be required under the law of any jurisdiction, (b) subject to the Intercreditor Agreement, obtaining "control" (as defined in any applicable Uniform Commercial Code or other law) over any DIP Collateral (and the applicable collateral agent or collateral trustee holding the first-priority lien thereon shall be deemed, without any further action, to have control over all the Debtors' deposit accounts, securities accounts and commodities accounts within the meaning of such Uniform Commercial Code and other law) or (c) taking any other action to validate or perfect the DIP Liens and the Prepetition Adequate Protection Liens or to entitle the DIP Liens and the Prepetition Adequate Protection Liens to the priorities granted in the Interim Order.<br><br>*See* Interim Order ¶ 5. |
| **Representations and Warranties** Bankruptcy Rule 4001 (c)(1)(B) | **DIP Notes Facility**<br><br>The Operative DIP Facility Documents will contain representations and warranties as are customary for debtor-in-possession financings of this type (including as necessary to address the filing and pendency of the Chapter 11 Cases), including with respect to: valid existence, requisite power, due authorization, no conflict with applicable law or contractual obligations, governmental consents, enforceability of the Operative DIP Facility Documents, financial statements and projections, no material adverse effect, no restricted junior payments, no adverse proceedings, taxes, properties, environmental matters, no default under the Operative DIP Facility Documents or contractual obligations, governmental regulations, margin stock, employee matters, employee benefit plans, fees, compliance with law, governmental and other approvals, no material misstatements, PATRIOT Act, communication paths, dealer programs, non-competition agreements, deposit accounts, anti-terrorism, OFAC and similar laws, tax status, and the continued effectiveness of the DIP Orders.<br><br>DIP Notes Term Sheet pg. 18-19. |

| | |
|---|---|
| | **DIP ABL Facility**<br><br>The DIP Revolving Credit Agreement will contain customary representations and warranties substantially similar to those contained in the Existing Revolving Credit Agreement, with such modifications to be consistent with the provisions of this Term Sheet (which will be applicable to each Debtor and its subsidiaries) to be made as of (x) the date the Borrower and the Guarantors execute the DIP Revolving Loan Documents and (y) each date upon which Advances are made under the DIP Revolving Facility, and in each case consistent with the representations and warranties provided by the Debtors to the DIP Term Lenders in respect of the DIP Term Facility but made applicable to the DIP Revolving Facility.<br><br>*See* DIP ABL Term Sheet pg. A-8, A-9. |
| **Affirmative and Negative Covenants**<br>Bankruptcy Rule 4001 (c)(1)(B) | The DIP Notes Facility and DIP ABL Facility shall contain affirmative and negative substantially similar to those set forth in the Prepetition Notes Documents and the Prepetition ABL Documents, respectively.<br><br>*See* DIP Notes Term Sheet pg. 20-21; *See* DIP ABL Term Sheet pg. A-9. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Notes Facility and DIP ABL Facility shall contain events of default substantially similar to those set forth in the Prepetition Notes Documents and the Prepetition ABL Documents, respectively, plus certain events of default related to the Milestones and the Chapter 11 Cases.<br><br>*See* DIP Notes Term Sheet pg. 22; *See* DIP ABL Term Sheet pg. A-11. |
| **Assignments & Participations**<br>Bankruptcy Rule 4001(c)(1)(B) | **DIP Notes Facility**<br><br>No consent of any Issuer or Guarantor required for any assignments or participations.  All assignments and participations in connection with the DIP Notes shall require a pro rata transfer of New Money DIP Notes, Roll-Up Notes, and Prepetition Notes.<br><br>*See* DIP Notes Term Sheet pg. 26.<br><br>**DIP ABL Facility**<br><br>Same terms and conditions as those in the Existing Revolving Credit Agreement, but without any approval or consent rights in favor of the DIP Debtors after an Event of Default.<br><br>*See* DIP ABL Term Sheet pg. A-11. |
| **Fees**<br>Bankruptcy Rule 4001 (c)(1)(B) | **DIP Notes Facility**<br><br><u>Closing Fees</u>:  Each DIP Noteholder shall receive a closing fee in the amount of 1.5% of its commitments with respect to New Money DIP Obligations under the DIP Facility.<br><br><u>Backstop Fees</u>: In exchange for the commitment by the Backstop DIP Noteholders to fund and backstop the DIP Facility as well as such other DIP Noteholders who execute the DIP Notes Purchase Agreement prior to the initial closing under the DIP Facility and fund their share of the Interim Commitments, such DIP Noteholders shall be entitled to a backstop fee of 3.5% of the Total Aggregate Commitment.<br><br>Each Closing Fee and each Backstop Fee shall be paid in connection with each purchase of DIP Notes by netting such Closing Fee or Backstop Fee from the amount funded by the applicable DIP Noteholder. |

24

|  | *See* DIP Notes Term Sheet pg. 7. |
|  | **DIP ABL Facility** |
|  | <u>Unused Line Fee</u>: Same as Prepetition ABL Documents. |
|  | <u>Closing Fees</u>: A fee in an amount equal to $1,100,000, payable ratably for the benefit of the DIP Revolving Lenders, earned and payable upon entry of the Interim Order. |
|  | <u>Appraisal and Examination Fees</u>: Same as Existing Revolving Credit Agreement; provided that, the ongoing inventory and collateral audit will in all events be reimbursed, and field exams shall be conducted from time to time at Agent's election and at Borrower's expense. |
|  | *See* DIP ABL Term Sheet Annex A-I. |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B) | <u>Budget</u>. Attached to the Interim Order as Exhibit A is a rolling 13-week cash flow budget (the "<u>Initial Approved Budget</u>") that reflects on a line-item basis the Debtors' (i) weekly projected cash receipts (including from non-ordinary course assets sales), (ii) weekly projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses under the Cases, including the fees and expenses of certain parties and their advisors, and capital expenditures), (iii) the sum of weekly unused purchase commitments under the DIP Notes Purchase Agreement plus unused commitments under the DIP ABL Facility plus unrestricted cash on hand (collectively, "<u>Aggregate Liquidity</u>"), and (iv) the weekly outstanding principal amount of the DIP Notes (including the principal amount of the Roll Up DIP Notes from and after the entry of a Final Order, subject to the terms of Paragraph 2(e)) and the DIP ABL Loans (including the principal amount of Roll Up DIP ABL Loans from and after the entry of the Final Order, subject to the terms of Paragraph 2(f) of the Interim Order) and letters of credit issued under the DIP LC Facility. |
|  | <u>Budget Updates and Approvals</u>.  Commencing on the fifth business day of the month following entry of the Interim Order, and continuing the fifth business day of each month thereafter, the Debtors shall prepare and deliver simultaneously to the DIP Secured Parties an updated "rolling" 13 week budget, which, once approved in writing by the Required DIP Noteholders and the DIP ABL Agent, each in their respective sole discretion, shall supplement and replace the Approved Budget or Supplemental Approved Budget (each as defined below), as applicable, then in effect (each such updated budget that has been approved in writing by each of the Required DIP Noteholders and the DIP ABL Agent, a "<u>Supplemental Approved Budget</u>") without further notice, motion, or application to, order of, or hearing before, this Court; <u>provided</u>, <u>however</u>, that the DIP Noteholders and the DIP ABL Agent shall have one week to approve each updated "rolling budget," and any such party that fails to timely provide the Debtors written notice of any objection to such updated "rolling budget" shall be deemed to have approved such updated "rolling budget"; <u>provided</u>, <u>further</u>, <u>however</u>, that unless and until the Required DIP Noteholders and the DIP ABL Agent have approved (or have been deemed to have approved as provided above) such updated budget, the Debtors shall still be subject to and be governed by the terms of the Initial Approved Budget or Supplemental Approved Budget, as applicable, then in effect in accordance with the Interim Order, and the DIP Noteholders shall have no obligation to purchase any additional DIP Notes and the DIP ABL Lenders shall have no obligation to make further DIP ABL Loans subject to such updated "rolling budget" or permit the use of Cash Collateral (including Cash Collateral in the Proceeds Account) with respect thereto, as applicable; provided, further, however, that after the occurrence of and during the continuation of an Event of Default, the Debtors shall deliver an updated proposed budget for approval in accordance with the foregoing on a weekly basis each Thursday, unless otherwise agreed by the Required DIP Noteholders and the DIP ABL Agent.  The Initial Approved Budget, as modified by all |

Supplemental Approved Budgets, shall constitute the "Approved Budget."

Variance Reports.    Commencing on the second Thursday following entry of the Interim Order, and continuing each Thursday thereafter, the Debtors shall prepare and deliver simultaneously to the DIP Secured Parties a variance report/reconciliation report certified by the Chief Financial Officer or Chief Restructuring Officer of the Debtors, in form acceptable to the Required DIP Noteholders and the DIP ABL Agent, setting forth on a line-item basis (A) the actual cash receipts, expenditures, disbursements, and outstanding DIP Notes and DIP ABL Loans balance (separating out the amount of the Roll Up DIP Notes and Roll Up DIP ABL Loans during the Interim Period) of the Debtors for such immediately preceding four week period and the Aggregate Liquidity and outstanding letter of credit exposure as of the end of such four-week period, (B) the variance in dollar amounts of the actual cash receipts, expenditures, disbursements, and outstanding revolving loan balance for each four-week period, and the actual Aggregate Liquidity and outstanding letter of credit exposure as of the end of such four-week period, from those budgeted amounts for, or as applicable, as of the end of, the corresponding period reflected in the Approved Budget, and (C) all post-petition expenses of the Debtors that are accrued and unpaid as of the end of the immediately preceding four week period.

Budget Covenants.  The Debtors shall only issue DIP Notes, borrow DIP ABL Loans, and expend Cash Collateral and other DIP Collateral proceeds to make payments required or permitted under the Interim Order and the Approved Budget (and in the case of the costs and expenses of (i) the DIP Noteholders, the DIP Collateral Trustee, the DIP Notes Trustee, and the DIP ABL Agent, in accordance with the DIP Documents and the Interim Order without being limited by the Approved Budget, and (ii) the Debtors' Professionals and any Committee's Professionals, in accordance with the DIP Documents and any applicable order of this Court), subject to the following permitted variances, which shall be tested initially on the second Thursday following the entry of the Interim Order (the "First Testing Date") (testing the period from the Petition Date through and including the Friday immediately preceding the First Testing Date (such initial testing period, the "First Testing Period")) and continuing on each Thursday thereafter (each, a "Subsequent Testing Date") (in each case, testing the shorter of (x) the period from the Petition Date to the Friday before the First Testing Date or (y) the trailing four week period ending on the Friday before the applicable Subsequent Testing Date (each, a "Testing Period")): (i)(A) for the First Testing Date and each of the next three Subsequent Testing Dates, the "Total Operating Disbursements" (calculated in the same manner as such "Total Operating Disbursements" in the Approved Budget were calculated) for the immediately preceding Testing Period shall not exceed 120%, for the First Testing Date, and 115% for the next three Subsequent Testing Dates, of such "Total Operating Disbursements" for such Testing Period as set forth in the Approved Budget and (B) for each Subsequent Testing Date thereafter, such "Total Operating Disbursements" (calculated in the same manner as such "Total Operating Disbursements" in the Approved Budget were calculated) shall not exceed 112% of the "Total Operating Disbursements" for the applicable Testing Period as set forth in the Approved Budget; and (ii)(A) for the First Testing Date and each of the next three Subsequent Testing Dates, the sum "Total Operating Receipts" (calculated in the same manner as such "Total Operating Receipts" in the Approved Budget were calculated) for the immediately preceding Testing Period shall not be less than 80% of the "Total Operating Receipts" for such Testing Period as set forth in the Approved Budget and (B) for each Subsequent Testing Date thereafter, such "Total Operating Receipts" (calculated in the same manner as such "Total Operating Receipts" in the Approved Budget were calculated) shall not be less than 85% of the "Total Operating Receipts" the applicable Testing Period as set forth in the Approved Budget.  Notwithstanding anything in the Interim Order, the Approved Budget, or any DIP Documents to the contrary, the DIP Debtors are prohibited from transferring any proceeds of the DIP Notes and the DIP ABL

26

| | |
|---|---|
| | Loans to (X) any non-Debtor (other than to certain foreign subsidiaries pursuant to the Discretionary Foreign Subsidiary DIP Notes Facility) or (Y) except as expressly set forth in the Approved Budget for purposes of funding the DIP Debtors' share of certain shared services, Real Industry, Inc., without the advance written consent of the Required DIP Noteholders and the DIP ABL Agent.  The foregoing covenants are collectively referred to herein as the "Budget Covenants."  Notwithstanding anything to the contrary in the Interim Order, the professional fees, costs, and expenses of the Debtors' Professionals and any Committee's Professionals (in each case, unless a Termination Event has occurred) and the DIP Collateral Trustee's, the DIP Noteholders', the DIP ABL Agent's and the Prepetition ABL Agent's advisors, respectively, shall be due, payable, and paid in accordance with any applicable order of this Court, notwithstanding any budgeted amounts for such fees, costs, and expenses set forth in the Approved Budget.<br><br>*See* Interim Order ¶ 2(g)-(h). |
| **Financial Covenants**<br>Bankruptcy Rule<br>4001 (c)(1)(B) | The DIP Notes Facility and DIP ABL Facility shall contain financial covenants substantially similar to those set forth in the Prepetition Notes Documents and the Prepetition ABL Documents, respectively.<br><br>*See* DIP Notes Term Sheet pg. 19-21; *See* DIP ABL Term Sheet pg. A-9. |
| **Liens and Priorities**<br>Bankruptcy Rule<br>4001 (c)(1)(B)(i) | Subject to the Carve-Out on the basis forth herein, the DIP Liens, the Prepetition Adequate Protection Liens, and the other Liens of the Prepetition Secured Parties shall have the following priorities:<br><br>(A) as to New DIP Collateral, including, subject to the entry of the Final Order, proceeds of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing (collectively, the "Avoidance Actions," which for avoidance of doubt, excludes Debtors' claims and causes of action under section 549 of the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing), whether received by judgment, settlement, or otherwise—first, on a *pari passu* basis the DIP Notes Liens and the DIP ABL Liens (with the relative priorities of the DIP Notes Liens securing the New Money DIP Notes Obligations and the Roll Up DIP Notes Obligations being determined by the DIP Notes Documents); second, the Prepetition Notes Adequate Protection Liens (as defined below); and third, the Prepetition ABL Adequate Protection Liens (as defined below);<br><br>(B) as to the DIP ABL Priority Collateral—first, any Prepetition Prior Liens; second, the DIP ABL Liens; third, any liens in favor of the Prepetition ABL Secured Parties, including the Prepetition ABL Adequate Protection Liens; fourth, the DIP Notes Liens securing the New Money DIP Notes Obligations; fifth, the DIP Notes Liens securing the Roll Up DIP Notes Obligations; and sixth, any liens in favor of the Prepetition Notes Secured Parties, including the Prepetition Notes Adequate Protection Liens; and<br><br>(C) as to all other DIP Collateral (including all DIP Notes Priority Collateral)—first, any Prepetition Prior Liens; second, the DIP Notes Liens securing the New Money DIP Notes Obligations; third, the DIP Notes Liens securing the Roll Up DIP Notes Obligations; fourth, any liens in favor of the Prepetition Notes Secured Parties, including the Prepetition Notes Adequate Protection Liens; fifth, the DIP ABL Liens; and sixth, any liens in favor of the Prepetition ABL Secured Parties, including the Prepetition ABL Adequate Protection Liens.<br><br>*See* Interim Order ¶ 2(n). |

| Indemnification<br>Bankruptcy Rule<br>4001 (c)(1)(B)(ix) | The DIP Notes Facility and DIP ABL Facility shall contain indemnification provisions substantially similar to those set forth in the Prepetition Notes Documents and the Prepetition ABL Documents, respectively. |
| --- | --- |

10.     In accordance with Local Rule 4001-2(a)(i)(A)-(G), the Debtors also draw the Court's attention to certain material provisions of the DIP Facilities and the relief set forth in the Interim Order:

     a.   ***Provisions that grant cross collateralization (Local Rule 4001-2(a)(i)(A))***. There are no provisions that grant cross-collateralization protection (other than the Adequate Protection Liens) to the Prepetition Secured Parties.

     b.   ***Provision or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien (Local Rule 4001-2(a)(i)(B))***. Without prejudice to any other party's rights to assert claims, counterclaims or causes of actions, objections, contests, or defenses prior to the expiration of the Challenge Period, the DIP Debtors stipulated to the validity and binding nature of the Prepetition Notes Obligations and the Prepetition ABL Obligations and that they are not subject to any defense. *See* Interim Order ¶¶ D-E.

     c.   ***506(c) rights (Local Rule 4001-2(a)(i)(C))***. Waived upon entry of the Interim Order in the case of the DIP Secured Parties and in respect of the Carve-Out, and subject to the entry of the Final Order in the case of the Prepetition Secured Parties. *See* Interim Order ¶ 8.

     d.   ***Provisions that immediately grant the prepetition secured creditor liens on the Debtors' claims and causes of action arising under 11 U.S.C. §§ 544, 545, 548 and 549 (Local Rule 4001-2(a)(i)(D))***. Subject to entry of the Final Order, the DIP Collateral includes proceeds of the DIP Debtors' claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code and the proceeds or property recovered in respect thereof. *See* Interim Order, ¶ 6(a)(i).

     e.   ***Provisions deeming prepetition debt to be postpetition debt (Local Rule 4001-2(a)(i)(E))***. The Interim Order requires the DIP Debtors apply all collections to repay the Prepetition ABL Obligations prior to entry of the Final Order.  In addition, upon entry of the Interim Order, the DIP Debtors will use approximately $17.5 million of DIP Notes to repay Prepetition ABL Obligations.  The DIP Debtors will then be permitted to reborrow such amounts from the DIP ABL Facility in accordance with its terms and the terms of the Interim Order.  Upon entry of the Final Order, the DIP

Debtors shall repay all remaining Prepetition ABL Obligations with the proceeds of the DIP ABL Facility and convert $170 million of the Prepetition Notes Obligations to Roll Up DIP Notes Obligations. *See* Interim Order, ¶ 2(e)-(f).

f.   ***Carve-Out (Local Rule 4001-2(a)(i)(F))***. The Interim Order contains no provisions for disparate treatment for any professionals retained by any Committee with respect to the Carve-Out, provided that only up to $50,000 of Cash Collateral will be made available to any Committee for investigations costs. *See* Interim Order, ¶ 16. The Debtors believe that the treatment of Professionals is fair and reasonable given the expected activities of the Debtors and any Committee during these Chapter 11 Cases.

g.   ***Non-consensual priming (Local Rule 4001-2(a)(i)(G))***. The Interim Order does not provide for non-consensual priming of any secured lien.

h.   ***552(b)(1) rights (Local Rule 4001-2(a)(i)(H))***. The DIP Liens and the DIP Superpriority Claims shall not be subject to the "equities of the case" exception of section 552 of the Bankruptcy Code. Subject to entry of the Final Order, the Prepetition Notes Adequate Protection Liens, the Prepetition Notes Adequate Protection Superpriority Claims, the Prepetition ABL Adequate Protection Liens, and the Prepetition ABL Adequate Protection Superpriority Claims shall not be subject to the "equities of the case" exception of section 552 of the Bankruptcy Code. *See* Interim Order ¶¶ 2(r), 3(c), 4(c).

## Background

## I.   General Background.

11.   On November 17, 2017 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). No party has requested the appointment of a trustee or examiner in the Chapter 11 Cases, and no statutory committees have been appointed or designated.

12.     A detailed description of the Debtors and their business, and the facts and circumstances supporting this Motion and the above-captioned Chapter 11 Cases, are set forth in greater detail in the First Day Declaration, which is incorporated by reference herein.

## II.     The Debtors' Prepetition Capital Structure.[9]

13.     As of the Petition Date, the funded secured debt obligations of the Real Alloy Debtors totaled approximately $401 million, excluding accrued and unpaid interest, letters of credit, and capitalized leases.  The primary components of the Debtors' consolidated funded debt obligations outstanding as of the Petition Date were:

| Debt Instrument | Principal Amount Outstanding |
|---|---|
| Prepetition ABL Credit Agreement (as defined herein) | $96 million |
| Senior Secured Notes Indenture (as defined herein) | $305 million |
| **Total** | **$401 million** |

### A.     Prepetition ABL Credit Facility.

14.     Debtor Real Alloy Holding, Inc. ("RA Holding") is the borrower representative under that certain Revolving Credit Agreement, dated as of March 14, 2017 (as amended, restated, supplemented, and otherwise modified from time to time, the "Prepetition ABL Credit Agreement"), by and among RA Holding, RA Canada, the other borrower parties and credit parties that are party thereto from time to time, Bank of America, N.A. ("Bank of America") for itself, as lender, letter of credit issuer, swingline lender and as agent (the "Prepetition ABL Agent") for all lenders (the "Prepetition ABL Lenders"), and Bank of America (acting through its Canadian branch) as a lender, which provides for a $110 million senior secured revolving asset-based credit facility (the "Prepetition ABL Credit Facility").  As of the Petition Date, there

---

[9]  The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits. In the event of inconsistency between this summary (including the defined terms therein) and such documents, the source documents shall control and govern.

is approximately $90 million in principal amount outstanding under the Prepetition ABL Credit Facility plus $5.6 million in letters of credit and accrued but unpaid interest.  The Prepetition ABL Credit Facility matures on March 14, 2022, unless terminated earlier in accordance with the Prepetition ABL Credit Agreement.

15.    Subject to the priorities set forth in the Prepetition Intercreditor Agreement (as defined herein), the obligations of the Prepetition U.S. ABL Grantors (as defined herein) arising in connection with the Prepetition ABL Facility (the "North America ABL Obligations"), are secured by, among other things: (a) a lien on substantially all of the current and fixed assets of Real Alloy Intermediate Holding, LLC ("RA Intermediate"), RA Holding, and each of RA Holding's direct and indirect wholly owned U.S. subsidiaries (other than Real Alloy Bens Run, LLC), (collectively, the "Prepetition U.S. ABL Grantors," and together with RA Canada, the "Prepetition ABL Grantors"); and (b) a pledge of (i) RA Intermediate's equity interest in RA Holding, (ii) RA Holding's equity interest in each of its direct first tier domestic subsidiaries, (iii) RA Holding's equity interest in each of its direct first tier foreign subsidiaries, subject to a cap of sixty-five percent (65%) of such equity interest in the voting stock of each such subsidiary, and (iv) Real Alloy Recycling, Inc.'s equity interest in each of its direct first tier subsidiaries, other than IMSAMET of Arizona (such collateral, collectively, the "U.S. ABL Collateral").

16.    Subject to the priorities set forth in the Prepetition Intercreditor Agreement, the obligations of RA Canada arising in connection with the Prepetition ABL Credit Facility (the "Canadian ABL Obligations," and, together with the North America ABL Obligations, the "Prepetition ABL Obligations"), are secured by, among other things: (a) a lien on substantially all of the current and fixed assets of RA Canada, (b) a lien on certain asserts of Real Alloy

31

Mexico Holdco, S. de R.L. de C.V.; and (c) a pledge of (i) RA Intermediate's equity interest in RA Holding, (ii) RA Holding's equity interest in each of its direct first tier domestic subsidiaries, (iii) RA Holding's equity interest in each of its direct first tier foreign subsidiaries, (iv) Real Alloy Recycling, Inc.'s equity interest in each of its direct first tier subsidiaries, other than IMSAMET of Arizona, and (v) RA Mexico Holding, LLC's equity interest in each of its direct first tier subsidiaries (such collateral, collectively, the "Canadian ABL Collateral").

17.    The North America ABL Obligations are guaranteed by each of the Prepetition U.S. ABL Grantors.  The Canadian ABL Obligations are guaranteed by the Prepetition U.S. ABL Grantors and RA Canada.

**B.    The 10% Senior Secured Notes.**

18.    Pursuant to that certain indenture dated as of January 8, 2015 (amended, restated, supplemented or otherwise modified from time to time, the "Senior Secured Notes Indenture"), RA Holding issued, and each of the Real Alloy Debtors guaranteed, those certain 10.00% senior secured notes due 2019 (the "Senior Secured Notes" and the holders of such notes, the "Senior Secured Noteholders").  As of the Petition Date, there were approximately $305 million in principal amount of Senior Secured Notes outstanding.  The next interest payment on account of the Senior Secured Notes will become due on January 15, 2018.  The Senior Secured Notes will become due on January 8, 2019, unless accelerated earlier in accordance with the Senior Secured Notes Indenture.

19.    Subject to the priorities set forth in the Prepetition Intercreditor Agreement (as defined herein), the obligations arising under the Senior Secured Notes Indenture, the Senior Secured Notes, and certain other obligations related thereto, including the Collateral Trust Hedging Obligations (as defined in the Prepetition Intercreditor Agreement (as defined herein)) (collectively, the "Notes Pari Passu Lien Obligations," and together with the Prepetition ABL

Obligations, the "Prepetition Secured Obligations," and the secured parties with respect thereto, the "Prepetition Secured Parties") are secured by a lien on collateral substantially similar to the U.S. ABL Collateral (the "Notes Collateral," and together with the U.S. ABL Collateral and the Canadian ABL Collateral, the "Prepetition Collateral").  The Notes Pari Passu Lien Obligations are guaranteed by each of the Real Alloy Debtors.

        **C.**      **Prepetition Intercreditor Agreement.**

        20.      The Prepetition ABL Agent and Wilmington Trust, National Association, as notes collateral trustee ("Notes Collateral Trustee") under the Senior Secured Notes Indenture and certain other credit documents related to the Notes Pari Passu Lien Obligations (the "Indenture Pari Passu Lien Debt Documents"), are party to that certain intercreditor agreement dated as of February 27, 2015 (the "Prepetition Intercreditor Agreement") pursuant to which, among other things, (a) the North America ABL Obligations are secured on a first priority basis by liens on substantially all of the U.S. ABL Collateral constituting North America ABL Priority Collateral (as defined in the Prepetition Intercreditor Agreement) and on a second priority basis by liens on substantially all of the U.S. ABL Collateral constituting Notes Priority Collateral (as defined in the Prepetition Intercreditor Agreement), and (b) the Notes Pari Passu Lien Obligations are secured on a first priority basis by liens on substantially all of the Notes Collateral that is Notes Priority Collateral and on a second priority basis by liens on substantially all of the Notes Collateral that is North America ABL Priority Collateral.

## The Real Alloy Debtors' Immediate Need for Cash

**I.**      **The Real Alloy Debtors Cannot Prudently Operate Their Business Without Obtaining Incremental Liquidity.**

        21.      Prior to the Petition Date, the Debtors, in consultation with their proposed financial advisor, Berkeley Research Group, LLC ("BRG"), reviewed and analyzed their

projected cash needs and prepared a projection (as updated from time to time in accordance with the terms of the DIP Credit Agreement, the "Budget," a copy of which is attached to the Interim Order as **Exhibit A**) of postpetition cash needs of the Real Alloy Debtors in the initial 13 weeks of the Real Alloy Debtors' Chapter 11 Cases.  The Debtors believe that the Budget and their projections with respect to the Real Alloy Debtors' funding requirements were prepared in good faith and based upon assumptions believed by the Real Alloy Debtors to be reasonable at the time so furnished, when taken as a whole.

22.     The Debtors reviewed the Budget and determined that the Real Alloy Debtors require access to postpetition financing sufficient to provide liquidity to administer the estates during the Chapter 11 Cases.  As set forth in the Budget, immediate access to the DIP Facilities (and the Cash Collateral) is essential to not only meet working capital and business operating needs, but also to fund the administration of the Chapter 11 Cases and enable the Real Alloy Debtors and their stakeholders to pursue a consensual sale of all or substantially all of their assets.  In sum, without the immediate relief requested by this Motion, the Real Alloy Debtors and their creditors face a material risk of substantial, irreparable, and ongoing harm.

**II.     The Proposed DIP Facilities Represent the Best Available Financing Option for the Real Alloy Business.**

23.     In October 2017, in parallel with their ongoing search for viable refinancing and recapitalization options, the Real Alloy Debtors directed Jefferies to begin contacting parties regarding the terms of potential debtor-in-possession financing facilities that would provide the Real Alloy Debtors with sufficient liquidity to stabilize operations, protect their supply chain, and successfully complete their restructuring process.  The Real Alloy Debtors and Jefferies designed a competitive marketing process to ensure that the Real Alloy Debtors would receive

multiple viable bids and to provide the flexibility to leverage these competing proposals and negotiate the most favorable terms possible.

24.    Jefferies solicited proposals for postpetition financing from the Real Alloy Debtors' existing lender and bondholders, large money-center banks, and other sophisticated alternative investment institutions familiar with the Real Alloy Debtors' capital structure. Ten other potential bidders executed non-disclosure agreements and received access to diligence materials. The Real Alloy Debtors generally did not share the identity of parties participating in the financing process with other lenders, except as necessary to maintain competitive tension during the process, and applicable confidentiality restrictions limited the bidders' ability to communicate with each other. The Real Alloy Debtors' management and advisors engaged in numerous in-person and telephonic discussions with potential lenders. Following an initial round of negotiations with potential investors, the Real Alloy Debtors requested that interested parties submit term sheets. Seven lenders submitted term sheets including the Prepetition Secured Parties. The majority of the proposals failed to provide the appropriate amount of funding required by the Real Alloy Debtors or sought to prime the collateral of the Prepetition Secured Parties. By November 1, 2017, the Real Alloy Debtors had received financing proposals from Bank of America, a steering committee of the largest holders of the Senior Secured Notes, and a large money-center bank, which varied in quantum, structure and expected collateral package.

25.    Over the following days, the Real Alloy Debtors continued their arms'-length and good faith negotiations regarding each financing proposal. The Real Alloy Debtors and their advisors responded to each of the proposals received with revised term sheets and continued nearly constant discussions with potential lenders and their advisors regarding key economic and

structural terms of the proposals under consideration.  Importantly, none of these potential sources of financing were willing to provide financing on a junior basis given the extent of the Prepetition Secured Parties' collateral coverage.  Thus, the Real Alloy Debtors were unable to obtain alternative postpetition financing proposals from other lenders through credit allowable as an administrative expense or secured by liens on the Real Alloy Debtors' assets that are junior to the liens of the Prepetition Secured Parties, or on otherwise better terms than those provided by the proposed DIP lenders.

26.     Based on this marketing process, and given size of the proposed DIP Facilities and terms and conditions related thereto, including the consensual priming of the Senior Secured Notes as provided by the proposed DIP Facilities, as well as the speed and willingness of the DIP Secured Parties to close, the Real Alloy Debtors and Jefferies determined that the DIP Facilities represent the best financing option available to the Real Alloy Debtors under the circumstances.

## III.     The Refinancing of the Prepetition ABL Obligations and Prepetition Notes Obligations is a Necessary Element of the DIP Facilities.

27.     A key feature of the proposed DIP financing is that the Interim Order requires the DIP Debtors apply all collections to repay the Prepetition ABL Obligations prior to entry of the Final Order.  In addition, upon entry of the Interim Order, the DIP Debtors will use approximately $17.5 million of DIP Notes to repay Prepetition ABL Obligations.  The DIP Debtors will then be permitted to reborrow such amounts from the DIP ABL Facility in accordance with its terms and the terms of the Interim Order.  Upon entry of the Final Order, the DIP Debtors are required to repay all remaining Prepetition ABL Obligations with the proceeds of the DIP ABL Facility and convert $170 million of the Prepetition Notes Obligations to Roll Up DIP Notes Obligations.

28.    The DIP Secured Parties required such refinancing of the Prepetition ABL Obligations and Prepetition Notes Obligations as a condition to the DIP financing.  Moreover, in consultation with Jefferies and after discussions with the DIP Secured Parties, the Real Alloy Debtors determined that they did not possess collateral adequate to obtain and secure the postpetition financing they require on sufficiently attractive and viable terms absent such refinancing.  Accordingly, the Real Alloy Debtors determined that the proposed DIP financing is the best available financing option, and the proposed repayment of the Prepetition ABL Credit Facility is necessary, given the Real Alloy Debtors' liquidity needs and time constraints.

## IV.    The Proposed DIP Facilities Will Send a Positive Signal to the Market and the Real Alloy Debtors' Suppliers and Customers.

29.    As described in the First Day Declaration, the Real Alloy Debtors operate in a highly competitive market.  The Real Alloy Debtors are certain that their suppliers, customers, employees, and other stakeholders will be focused on whether the Chapter 11 Cases are appropriately capitalized such that the Real Alloy Debtors can continue operating as a going concern while they pursue a sale under section 363 of the Bankruptcy Code.  The Real Alloy Debtors' suppliers have already demonstrated that they will not be willing to supply aluminum scrap on anything longer than cash-on-delivery terms if they doubt the Real Alloy Debtors' viability.  However, access to the DIP Facilities will allow the Real Alloy Debtors (among other things) to purchase aluminum scrap and restore normalized trade credit terms with their suppliers and the confidence of the Real Alloy Debtors' customers.  Returning to the Real Alloy Debtors' historic average of 30-day trade terms, would result in approximately $5-7 million of new liquidity.

30.    Access to increased cash and liquidity is particularly relevant now because the Real Alloy Debtors' industry is highly cyclical.  Historically speaking, the Real Alloy Debtors

accumulate inventory during the fall months rather than the winter months when prices are materially higher.  Thus, to the extent the Real Alloy Debtors can, in the near future, obtain access to additional liquidity through the DIP Facilities and relaxed trade terms, they will be able to purchase aluminum scrap and other raw materials at reduced prices and improve the profitability of the Real Alloy business.  Moreover, the Real Alloy Debtors inventories of aluminum scrap and other raw materials are low, and an extended delay in the delivery of such materials would negatively impact certain of the Real Alloy Debtors' facilities until inventory can be delivered.  The DIP Facilities will prevent, or at least minimize, such delays.

31.    Finally, beyond the immediate need for cash to replenish inventory, the DIP Facilities will provide the Real Alloy Debtors with the long-term liquidity that they need to stabilize and maintain their business.  By beginning to execute on their business plan now, the Real Alloy Debtors will increase and maximize the value of their estates for the benefit of all parties in interest.

## Basis for Relief

**I.    The Real Alloy Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents and the DIP Orders.**

**A.    Entry into the DIP Documents is an Exercise of the Real Alloy Debtors' Sound Business Judgment.**

32.    The Bankruptcy Court should authorize the Real Alloy Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facilities, and continue using the Cash Collateral and other Prepetition Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances that are present in these cases, as discussed herein.  Courts grant a debtor-in-possession considerable deference when acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run

afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See*, *e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").

33.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006), *rev'd on other grounds* 607 F.3d 957 (3d Cir. 2010); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

34.    Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. of Escanaba (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986)

ny-1305305
670646.1 11/17/2017

(recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

35.     The Bankruptcy Court may also appropriately take into consideration non-economic benefits to the Real Alloy Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.* This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.   That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

36.     The decision to move forward with the DIP Facilities following an arm's-length marketing and negotiation process is well within the Real Alloy Debtors' sound business judgment.  Specifically, the DIP Facilities will allow the Real Alloy Debtors to: (a) acquire in a timely fashion the aluminum scrap and other raw materials necessary to operate their business; (b) restore favorable trade terms with suppliers and to reassure other stakeholders, including landlords and employees, that the Real Alloy business will continue as a going concern; (c) fund payroll obligations; (d) fund the administrative cost of the Chapter 11 Cases; and (e) provide a path to emergence.  Moreover, the Real Alloy Debtors negotiated the DIP Credit Agreement and DIP Documents with the DIP Secured Parties in good faith, at arm's-length, and with the

assistance of their respective advisors, and the Real Alloy Debtors believe the proposed DIP Facilities represent the best available financing under the current circumstances.

> **B.**     **The Real Alloy Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

37.     The Real Alloy Debtors propose to obtain financing under the DIP Facilities by providing security interests, liens, and superpriority claims as set forth in the DIP Documents and the DIP Orders pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.  Specifically, the Real Alloy Debtors propose to provide to the DIP Secured Parties, subject to the Carve-Out and the priorities set forth in the DIP Orders, (a) first priority liens on the North America ABL Priority Collateral and unencumbered property of certain non-Debtor subsidiaries of the Real Alloy Debtors, and (b) second priority liens on the Notes Priority Collateral, subordinated only to the liens securing the Notes Pari Passu Lien Obligations.

38.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and a hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503 (b)(1) of [the Bankruptcy Code]." 11 U. S.C. § 3 64(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).   Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

> a.     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;
>
> b.     the credit transaction is necessary to preserve the assets of the estate; and
>
> c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See, e.g.*, *In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores*, 115 B.R. at 37-40; *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

39.     The Real Alloy Debtors meet each part of this test:  ***First***, as described above and as set forth in the White Declaration, the Real Alloy Debtors' high level of existing secured debt obligations prevented any third-party lender from providing postpetition financing on an unsecured or junior priority basis, as proven by Jefferies' marketing process.  ***Second***, the Real Alloy Debtors require access to the DIP Facilities to provide adequate liquidity for the operation of the Real Alloy business.  Absent such relief, the Real Alloy Debtors will suffer material, immediate, and irreparable harm, and the value of the Real Alloy Debtors' estates would be significantly impaired to the detriment of all stakeholders.  ***Finally***, the Real Alloy Debtors and DIP Secured Parties negotiated the DIP Facilities in good faith, at arm's length, and in a competitive lending market.  Given these circumstances, the Real Alloy Debtors believe that the terms of the DIP Facilities, as set forth in the DIP Credit Agreement, are fair, reasonable, and adequate.  For all these reasons, the Real Alloy Debtors submit that they have met the standard for obtaining postpetition financing under section 364(c) of the Bankruptcy Code.

40.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien." As described above, the Real Alloy Debtors are unable to obtain unsecured credit.  Therefore,

ny-1305305
670646.1 11/17/2017

approving superpriority claims and liens over unencumbered property of the Real Alloy Debtors in favor of the DIP Secured Parties is also reasonable and appropriate.

### C.    No Better Alternative to the DIP Facilities Is Reasonably Available.

41.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code.  *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).   Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *see also Snowshoe*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *Ames Dep't Stores*, 115 B.R. at 37–40 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).  In this case, the Real Alloy Debtors, with their advisors, undertook an ambitious marketing process in a very short period of time, broadly soliciting financing proposals from their existing stakeholders and from other large banks and investment institutions.   Approximately six prospective lenders conducted in-depth diligence, and the Real Alloy Debtors' management and advisors engaged each in earnest good faith, arm's-length, and hard fought negotiations.

42.    These competitive multi-party negotiations led to more favorable terms than were previously proposed by various potential lenders.   Given the complexities of the Real Alloy Debtors' existing capital structure and the shortened timeframe faced, the Real Alloy Debtors

believe that the DIP Facilities are the best possible financing arrangement available under the circumstances.  Therefore, the Real Alloy Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable is satisfied.

## II.   The Use of Cash Collateral and the Provision of Adequate Protection is Warranted and Should be Approved.

43.   Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor-in-possession to use cash collateral with the consent of the secured party.  Here, the DIP Secured Parties consent to the Real Alloy Debtors' use of the Cash Collateral (as well as the other Prepetition Collateral), subject to the terms and limitations set forth in the Interim Order, including the provision of the Adequate Protection Liens and the Adequate Protection Superiority Claims.

44.   Section 363(e) of the Bankruptcy Code provides for adequate protection against diminution in value of a creditor's interests in cash when a debtor uses cash collateral or other prepetition collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 53 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Rocco*, 319 B.R. 411 (Bankr. W.D. Pa. 2005); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *see also In re Dynaco Corp.*, 162 B.R. 3 89, 3 94 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 3 6 1.01[1] at 3 61–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).  It was the intent

44

of Congress in section 361 of the Bankruptcy Code to give courts flexibility to fashion relief in each case in light of general equitable principals. *In re Wilson*, 30 B.R. 371 (Bankr. E.D. Pa. 1983).

45.    As set forth in the Interim Order and as described above, the Real Alloy Debtors propose to provide the Prepetition Secured Parties with a variety of forms of adequate protection to protect against the postpetition diminution in value of the Prepetition Collateral, including the provision of Adequate Protection Liens and the Adequate Protection Superpriority Claims.

46.    The Real Alloy Debtors submit that the proposed adequate protection package for their Prepetition Secured Lenders, including the Adequate Protection Liens and Adequate Protection Superpriority Claims, is sufficient to protect the Prepetition Secured Parties from any diminution in value of the Cash Collateral and the other Prepetition Collateral.  In light of the foregoing, the Real Alloy Debtors further submit that the proposed adequate protection package is fair and appropriate under the circumstances of the Chapter 11 Cases and is sufficient to justify the Real Alloy Debtors' continued use of the Prepetition Collateral, including Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

**III.    The Real Alloy Debtors Should Be Authorized to Pay the Fees and Expenses and Payments Required Under the DIP Documents.**

47.    Pursuant to the DIP Documents and as consideration for the extension of postpetition financing, the Debtors have agreed, subject to Court approval, to pay certain fees related to the DIP Facilities.  It is understood and agreed by all parties that these fees and expenses are an integral component of the overall terms of the DIP Facilities, and were required by the DIP Agent and the DIP Secured Parties as consideration for the extension of postpetition financing after arm's length and good faith negotiations.  Accordingly, the Bankruptcy Court

45

should authorize the Real Alloy Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

## IV.    The Proposed Repayment of Certain Prepetition Obligations is Necessary and Appropriate.

48.    As set forth above, the Interim Order requires the DIP Debtors apply all collections to repay the Prepetition ABL Obligations prior to entry of the Final Order.[10]  In addition, upon entry of the Interim Order, the DIP Debtors will use approximately $17.5 million of DIP Notes to repay Prepetition ABL Obligations.  The DIP Debtors will then be permitted to reborrow such amounts from the DIP ABL Facility in accordance with its terms and the terms of the Interim Order.  Upon entry of the Final Order, the DIP Debtors shall repay all remaining Prepetition ABL Obligations with the proceeds of the DIP ABL Facility and convert $170 million of the Prepetition Notes Obligations to Roll Up DIP Notes Obligations

49.    As set forth above, pursuant to the Interim Order, the DIP Debtors will issue DIP Notes to repay approximately $17.5 million of the Prepetition ABL Obligations, and the Final Order requires the DIP Debtors to repay all of the Prepetition ABL Obligations with the proceeds of the DIP ABL Facility and convert $170 million of the Prepetition Notes Obligations to Roll Up DIP Notes Obligations.  Importantly, notwithstanding the refinancing or "roll-up" of these Prepetition Secured Obligations, the Prepetition Secured Lenders will not receive any additional material collateral to secure such obligaitons (other than the proceeds of Avoidance Actions).

50.    In addition, the repayment merely accelerates the satisfaction of the obligations on the Prepetition ABL Credit Facility without affecting recovery to other creditors because the Real Alloy Debtors believe that these prepetition obligations are fully secured by perfected, first

---

[10]  The Debtors expect to receive approximately $15 million in collections on a weekly basis between the Petition Date and the Final Hearing.

priority liens with respect to, among other things, the North America ABL Priority Collateral, which has a value in excess of the outstanding Prepetition ABL Obligations. Finally, the repayment and limited roll-up of these Prepetition Secured Obligations was required to obtain postpetition financing of the size and on the terms of the DIP Facility. Therefore, the repayment and limited roll-up of the Prepetition Secured Obligations was a necessary prerequisite to acquiring postpetition financing.

51.     Without access to the DIP Facilities, the Real Alloy Debtors would have insufficient liquidity to continue their business operations. Maintaining the ability to continue as a going concern is of immense benefit to the Real Alloy Debtors' estates and will maximize value for the benefit of all of their stakeholders. Thus, after careful consideration of all available alternatives, the Debtors have determined that refinancing the Prepetition ABL Credit Facility and rolling up a portion of the Prepetition Notes Obligations is the best means to obtain access to the liquidity necessary to preserve the value of their Real Alloy business for the benefit of all stakeholders. Further, as previously noted, the repayment of the Prepetition ABL Obligations in full with the proceeds of the Revolving DIP Facility has no prejudicial effect on any parties in interest because the Prepetition ABL Lenders, who are oversecured, would have received a full recovery upon emergence. Moreover, the Prepetition Secured Parties have agreed (a) to fund an investigation of the liens securing their Prepetition Secured Obligations without the roll up affecting any challenge to their liens, and (b) that they will not vote any deficiency claim they may have in a manner that blocks confirmation of a liquidating chapter 11 plan.

52.     Repayment of prepetition claims with postpetition financing as well as similar refinancings of prepetition claims with postpetition credit, may be authorized under section 363(b) of the Bankruptcy Code. *See In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 510-11 (Bankr.

D. Del. 2010) ("Post-petition refinancing of uneconomical *secured* debt through a DIP loan may be authorized by section 363(b) of the Bankruptcy Code as a use of estate property outside the ordinary course of business . . . similarly, prepetition secured claims can be paid off through a roll-up."); *In re Energy Future Holding Corp.*, 527 B.R. 157, 167 (D. Del. 2015); *Del. Trust Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 2015 U.S. Dist. LEXIS 196 84, 20-21 (D. Del. Feb. 9, 2015) (*quoting Capmark*, 43 8 B.R. at 511).

53.    Courts consider a number of factors when determining whether to authorize repayment of prepetition debt into postpetition financing facilities, including whether: (a) the proposed financing is an exercise of sound and reasonable business judgment; (b) no alternative financing is available on any other basis; (c) the financing is in the best interests of the estate and its creditors; (d) no better offers, bids, or timely proposals are before the court; (e) the credit transaction is necessary to preserve the assets of the estate; (f) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender(s); (g) the financing is necessary, essential, and appropriate for the continued operating of the debtor's business and the preservation of the estate; and (h) the financing agreement was negotiated in good faith and at arm's-length between the debtor and the proposed lenders. *See In re Farmland Indus., Inc.*, 294 B.R. at 879–80.

54.    Recognizing exigent circumstances like those described above, courts in this and other jurisdictions have approved prepetition debt repayment funded by debtor-in-possession financing proceeds in recent chapter 11 cases. *See, e.g.*, *In re True Religion Apparel, Inc.*, No. 17-11460 (CSS) (Bankr. D. Del. Aug. 01, 2017); *In re Aerogroup International, Inc.*, No. 17-11962 (KJC) (Bankr. D. Del. Nov. 11, 2017); *In re Aeropostale*, No. 16-11275 (SHL) (Bankr. S.D.N.Y. June 13, 2016); *In re James River Coal Company,* No. 14-31848 (KRH) (Bankr. E.D.

Va. May 9, 2014); *In re The Great Atlantic & Pacific Tea Company*, No. 10-24549 (Bankr

S.D.N.Y. Jan. 11, 2011)*; In re Movie Gallery*, No. 07-33849 (Bankr E.D. Va. Nov. 14, 2007).[11]

55.     Further, courts in this and other jurisdictions authorizing first day, interim relief

under postpetition financing facilities have permitted such interim borrowings to be applied

towards the repayment of prepetition obligations.  *See, e.g.*, *In re True Religion Apparel, Inc.*,

No. 17-11460 (CSS) (Bankr. D. Del. Jul. 06, 2017); *In re Aerogroup International, Inc.*, No. 17-

11962 (KJC) (Bankr. D. Del. Oct. 15, 2017); *In re Aeropostale,* No. 16-11275 (Bankr. S.D.N.Y.

May 6, 2016) (SHL); *In re James River Coal Company*, No. 14-31848 (KRH) (Bankr. E.D. Va.

Apr. 9, 2014); *In re The Great Atlantic & Pacific Tea Company*, No. 10-24549 (RDD) (Bankr.

S.D.N.Y. Dec. 13, 2010); *In re Bear Island Paper Company*, No. 10-31202 (KLP) (Bankr. E.D.

Va. Feb. 26, 2010); *In re Movie Gallery,* No. 07-3 3 849 (Bankr. E.D. Va. Oct. 16, 2007).

56.     Consistent with this authority, the Debtors respectfully submit that the

Bankruptcy Court should approve the Real Alloy Debtors' decision to enter into the DIP

Facilities, including the repayment of Prepetition Secured Obligations with proceeds from the

DIP Facilities as a sound exercise of the Real Alloy Debtors' business judgment.

**V.      The DIP Secured Parties Should Be Deemed Good-Faith Lenders
         Under Section 364(e).**

57.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to

collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal.  Section 364(e) of the Bankruptcy Code provides that:

>        The reversal or modification on appeal of an authorization under
>        this section [364 of the Bankruptcy Code] to obtain credit or incur

---

[11]  Because of the voluminous nature of the orders cited herein, such orders have not been attached to this
Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

> debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

58.    As explained herein, and in the White Declaration, the DIP Documents and the DIP Orders are the result of the Real Alloy Debtors' reasonable and informed determination that the DIP Secured Parties offered the most favorable terms on which to obtain vital postpetition financing and arm's-length, good-faith negotiations between the Real Alloy Debtors and the DIP Agent and DIP Secured Parties.  The terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facilities will be used pursuant to the Budget and only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Documents or under the DIP Orders other than as described herein.  Accordingly, the Bankruptcy Court should find that the DIP Secured Parties are "good-faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**VI.    The Automatic Stay Should Be Modified on a Limited Basis.**

59.    The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Secured Parties to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order.  The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Real Alloy Debtors to grant the DIP Liens to the DIP Secured Parties and to incur all liabilities and obligations set forth in the Interim Order.  Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default (as

defined in the DIP Documents), the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP Documents, the DIP Orders, or applicable law.

60.    Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Real Alloy Debtors' business judgment, are reasonable and fair under the circumstances of the Chapter 11 Cases. *See, e.g.*, *In re True Religion Apparel, Inc.*, No. 17-11460 (CSS) (Bankr. D. Del. Jul. 06, 2017); *In re Aerogroup International, Inc.*, No. 17-11962 (KJC) (Bankr. D. Del. Oct. 15, 2017); *In re Penn Va. Corp.*, No. 16-32395 (KLP) (Bankr. E.D. Va. June 8, 2016) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Alpha Natural Res., Inc.*, No. 15-33896 (KRH) (Bankr. E.D. Va. Sept. 17, 2015); *In re Patriot Coal Corp.*, No. 15-32450 (KLP) (Bankr. E.D. Va. June 4, 2015) (same); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015); *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012).

## VII.    Interim Relief Should be Granted.

61.    Bankruptcy Rules 4001 (b) and 4001 (c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Bankruptcy Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

ny-1305305
670646.1 11/17/2017

62.     For the reasons noted above, the Real Alloy Debtors have an immediate postpetition need to use Cash Collateral and other Prepetition Collateral, and access the liquidity provided by the DIP Facilities. The Real Alloy Debtors cannot maintain the value of their estates during the pendency of the Chapter 11 Cases without access to cash.  The Real Alloy Debtors will use cash to, among other things, fund the operation of their business, ensure that suppliers continue to provide the Real Alloy business with scrap aluminum and other raw materials, and fund the administration of the Chapter 11 Cases.  Substantially all of the Real Alloy Debtors' available cash constitutes the Prepetition Secured Parties' Cash Collateral.  The Real Alloy Debtors will therefore be unable to operate their business or otherwise fund the Chapter 11 Cases without access to Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In short, the Real Alloy Debtors' ability to administer the Chapter 11 Cases through the use of Cash Collateral is vital to preserve and maximize the value of the Real Alloy Debtors' estates.

63.     The Debtors request that the Bankruptcy Court conduct a hearing to consider entry of the Interim Order authorizing the Real Alloy Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facilities on the terms and conditions set forth in the Interim Order.  This relief will enable the Real Alloy Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## **REQUEST FOR FINAL HEARING**

64.     Pursuant to Bankruptcy Rules 4001 (b)(2) and 4001 (c)(2), the Debtors request that the Bankruptcy Court set a date for the Final Hearing that is as soon as practicable, and in no event after 21 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

ny-1305305
670646.1 11/17/2017

## <u>WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)</u>

65.    To implement the relief requested herein successfully, the Debtors respectfully request that the Interim Order and Final Order provide that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## <u>COMPLIANCE WITH BANKRUPTCY RULE 4001 AND<br>LOCAL RULES 4001-1 AND 4001-2</u>

66.    To the best of the Debtors' knowledge and belief, this Motion complies with Bankruptcy Rule 4001 and Local Rules 4001-1 and 4001-2.  To the extent that this Motion does not comply in all respects with the requirements of Bankruptcy Rule 4001 and Local Rules 4001-1 and 4001-2, the Debtors believe that such deviations are not material and respectfully request that such requirements be waived.

## <u>RESERVATION OF RIGHTS</u>

67.    Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code, any foreign bankruptcy or insolvency law, or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.

**NOTICE**

68.     Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel: (a) the Office of the United States Trustee; (b) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis, excluding insiders); (c) Wilmington Trust, N.A.; (d) the Securities & Exchange Commission; (e) the Office of the United States Attorney General for the District of Delaware; (f) the offices of the attorneys general for the states in which the Debtors operate; (g) the Internal Revenue Service; (h) the U.S. Department of Justice; (i) counsel to the DIP Lenders; (j) the Banks, and (k) the United States Environmental Protection Agency.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

ny-1305305
670646.1 11/17/2017

WHEREFORE, the Debtors respectfully request that the Bankruptcy Court enter the DIP

Orders, granting the relief requested herein and such other relief as the Bankruptcy Court deems

appropriate under the circumstances.

Dated: November 17, 2017  
       Wilmington, Delaware

*/s/ Monique B. DiSabatino*  
Mark Minuti (DE Bar No. 2659)  
Monique B. DiSabatino (DE Bar No. 6027)  
SAUL EWING ARNSTEIN & LEHR LLP  
1201 N. Market Street, Suite 2300  
P.O. Box 1266  
Wilmington, Delaware 19899  
Telephone: (302) 421-6840  
Facsimile: (302) 421-5873  
mark.minuti@saul.com  
monique.disabatino@saul.com

-and-

Sharon L. Levine (*pro hac vice* admission pending)  
SAUL EWING ARNSTEIN & LEHR LLP  
1037 Raymond Boulevard, Suite 1520  
Newark, New Jersey 07102  
Telephone: (973) 286-6718  
Facsimile: (973) 286-6821  
sharon.levine@saul.com

-and-

Gary S. Lee (*pro hac vice* admission pending)  
Todd M. Goren (*pro hac vice* admission pending)  
Mark A. Lightner (*pro hac vice* admission pending)  
Benjamin Butterfield (*pro hac vice* admission pending)  
MORRISON & FOERSTER LLP  
250 West 55th Street  
New York, New York 10019  
Telephone: (212) 468-8000  
Facsimile: (212) 468-7900  
glee@mofo.com  
tgoren@mofo.com  
mlightner@mofo.com  
bbutterfield@mofo.com

*Proposed Counsel for Debtors and*  
*Debtors-in-Possession*