## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| REAL INDUSTRY, INC., *et al.*[1] | ) | Case No. 17-12464 (KJC) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

**DEBTORS' MOTION FOR ENTRY OF ORDERS (A)(I) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF ASSETS, (II) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (III) ESTABLISHING PROCEDURES IN CONNECTION WITH THE SELECTION AND PROTECTIONS AFFORDED TO ANY STALKING HORSE BIDDERS, (IV) APPROVING FORM AND MANNER OF NOTICE RELATING THERETO, (V) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE, AND (VI) GRANTING RELATED RELIEF; (B)(I) APPROVING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED <u>LEASES, AND (III) GRANTING RELATED RELIEF</u>**

By this motion (the "<u>Motion</u>"), Real Industry, Inc. ("<u>Real Industry</u>") and its affiliated debtors and debtors-in-possession (the "<u>Real Alloy Debtors</u>," and with Real Industry, collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>") seek entry of: (a) an order (the "<u>Bidding Procedures Order</u>"), substantially in the form attached hereto as **Exhibit A**, pursuant to sections 105, 363, 365, 503, and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and rules 6004-1 and rule 9013-1 of the Local

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Real Industry, Inc. (3818), Real Alloy Intermediate Holding, LLC (7447), Real Alloy Holding, Inc. (2396), Real Alloy Recycling, Inc. (9798), Real Alloy Bens Run, LLC (3083), Real Alloy Specialty Products, Inc. (9911), Real Alloy Specification, Inc. (9849), ETS Schaefer, LLC (9350), and RA Mexico Holding, LLC (4620).  The principal place of business for the Real Alloy Debtors is 3700 Park East Drive, Suite 300, Beachwood, Ohio 44122.

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") (i) approving the proposed auction (the "Auction") and bidding procedures attached to the Bidding Procedures Order as **Exhibit 1** (the "Bidding Procedures") for the sale of the Real Alloy Debtors' assets (the "Assets"), (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"), (iii) establishing procedures in connection with the selection of Stalking Horse Bidders (as defined below) and protections to be afforded thereto, (iv) approving the form and manner of notice of all procedures, protections, schedules, and agreements, (v) scheduling a hearing (the "Sale Hearing") to approve the sale transaction (the "Sale Transaction"), and (vi) granting related relief; and (b) an order (the "Sale Order"),[2] pursuant to sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules 6004-1 and 9013-1 (i) approving the sale of the Assets free and clear of all liens, claims, interests, and encumbrances ("Interests") to the winning bidder (the "Successful Bidder") pursuant to a purchase agreement to be executed by the Successful Bidder (the "Asset Purchase Agreement"), (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases, and (iii) granting related relief.   In support of the Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.     Earlier this year, the Debtors and their proposed investment banker, Jefferies LLC ("Jefferies") engaged in a concerted effort to raise liquidity for the third-party aluminum recycling business (the "Real Alloy" business) operated by the Real Alloy Debtors and their non-

---

[2] The form of Sale Order will be filed with the Court on or before March 19, 2018, or as soon as practicable thereafter.

Debtor subsidiaries.[3]  In addition to seeking refinancing for their funded debt, the Real Alloy Debtors also began a parallel marketing process to identify and engage with strategic or financial partners interested in acquiring up to substantially all of the Real Alloy business.  Unfortunately, the Real Alloy Debtors did not have sufficient liquidity to allow this marketing process to run its course outside of bankruptcy and accordingly filed their Chapter 11 Cases without a "stalking horse" bidder.

2.      Having analyzed and considered all strategic options, the Real Alloy Debtors remain convinced that a Court-supervised sale process for substantially all of their assets will maximize the value of their estates and is in the best interests of all of the Real Alloy Debtors' stakeholders.  Accordingly, on the Petition Date (as defined below), the Real Alloy Debtors filed a motion seeking authority to obtain up to $365 million of debtor-in-possession financing (the "DIP Financing") from their incumbent secured lenders to provide the Real Alloy Debtors with operational liquidity necessary to run a value-maximizing marketing process.  The Court (as defined below) has approved $50 million of DIP Financing on an interim basis, and the Real Alloy Debtors expect to obtain approval for the remainder of their proposed DIP Financing at their "second day" hearing, which is currently scheduled for December 19, 2017.

3.      By this Motion, the Debtors seek authority to pursue a sale process that is expected to result in the disposition of substantially all of the Real Alloy Debtors' assets through the sale of the Real Alloy Debtors' RANA and RAEU business segments, either together or separately.  The Debtors expect that the proposed sale process will result in the highest value for the Real Alloy Debtors' estates, as well as the preservation of jobs and the Real Alloy business

---

[3]  As discussed in the First Day Declaration (as defined below), the Real Alloy business includes a North American business segment operated primarily by the Real Alloy Debtors ("RANA") and a European business segment operated by non-Debtor foreign subsidiaries ("RAEU").

3

as a going concern.  For these reasons, and the reasons discussed below, the Motion should be granted and the Real Alloy Debtors should be authorized to implement the fair and reasonable Bidding Procedures (defined below) to obtain the highest and best offer for their assets.

## JURISDICTION AND VENUE

4.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.   This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-l(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     The statutory and procedural bases for the relief requested herein are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules 6004-1 and 9013-1.

## BACKGROUND

7.     On November 17, 2017 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).   No party has requested the appointment of a trustee or examiner in these Chapter 11 Cases, and no statutory committees have been appointed or designated.

8.     A detailed description of the Debtors and their business, and the facts and circumstances supporting this Motion and the above-captioned Chapter 11 Cases, are set forth in greater detail in the *Declaration of Michael J. Hobey in Support of Chapter 11 Petitions and Requests for First Day Relief* [Docket No. 3] (the "First Day Declaration"), which is incorporated herein by reference.

## THE PROPOSED SALE

9.     As set forth in detail in the First Day Declaration, the Real Alloy Debtors are trusted partners in the aluminum recycling industry.  The Real Alloy Debtors have long-standing relationships with diverse customers, including many leading auto manufacturers and other blue-chip multinational companies.  Notwithstanding recent improvements in Real Alloy's business, certain macroeconomic factors and non-recurring events have left the Real Alloy Debtors with unsustainable debt service obligations, which require a deleveraging of their balance sheets to provide operational liquidity and a rightsized capital structure going forward.

10.     After engaging in discussions with their various stakeholder constituents, including their prepetition secured lenders, the Real Alloy Debtors have determined that a sale of substantially all of their assets, including their equity interests in non-Debtor subsidiaries located outside the United States, to one or more well-capitalized strategic or financial buyer(s) will maximize the value of their estates, allow the Real Alloy business to take advantage of favorable market conditions, and provide the best possible path forward for their creditors, employees, customers, vendors and other stakeholders.  Accordingly, the Real Alloy Debtors are seeking approval of the proposed Bidding Procedures and a Sale Transaction as set forth herein.

## THE PROPOSED STALKING HORSE SELECTION PROCEDURES
## AND BIDDING PROCEDURES

### A.    Bidding Procedures

11.    The Bidding Procedures, which are attached to the Bidding Procedures Order as **Exhibit 1**, are designed to maximize value for the Real Alloy Debtors' estates, while effectuating an expeditious sale of the Assets.   Among other things, the Bidding Procedures set forth a process by which the Debtors may select one or more stalking horse bidders, procedures for interested parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of any ultimately successful bidder(s), and the deadlines with respect to the foregoing.

12.    Certain of the salient terms of the Bidding Procedures are highlighted below[4]:

- **Key Proposed Action and Sale-Related Dates (subject to the Court's availability):**

| Event | Proposed Date |
|---|---|
| Deadline to serve Bidding Procedures Order on Transaction Notice Parties | Within three days of entry of Bidding Procedures Order. |
| Final Stalking Horse Proposal Deadline | January 18, 2018 |
| Deadline to file Stalking Horse Notice (including proposed Bid Protections and Stalking Horse Agreement) | January 23, 2018 |
| Stalking Horse Objection Deadline | January 29, 2018 |

---

[4] The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures.  In the event of any inconsistencies between the provisions of the Bidding Procedures and the summary set forth herein, the terms of the Bidding Procedures shall govern.  Capitalized terms that are used but not defined in the following summary shall have the meanings ascribed to such terms in the Bidding Procedures or Bidding Procedures Order (as applicable).

6

| Event | Proposed Date |
|---|---|
| Deadline to file schedules to Stalking Horse Agreement | March 7, 2018 |
| Bid Deadline | March 19, 2018 at 4:00 p.m. (prevailing Eastern Time) |
| Sale Objection Deadline (*e.g.*, deadline for objecting to sale to a Stalking Horse Bidder) | March 22, 2018 at 4:00 p.m. (prevailing Eastern Time) |
| Auction (if necessary) | March 27, 2018 at 10:00 a.m. (prevailing Eastern Time) |
| Deadline to file and serve notice of Successful Bidder and amount of Successful Bid | The earlier of five business hours after the Auction is completed or noon the calendar day after the Auction is completed |
| Auction Objection Deadline (*e.g.*, deadline for objecting to sale to a Successful Bidder that is not a Stalking Horse Bidder) | March 28, 2018 at 12:00 p.m. (prevailing Eastern Time) |
| Sale Hearing | March 29, 2018 at 10:00 a.m. (prevailing Eastern Time) |

- **Key Dates Related to Proposed Assumption and Assignment Procedures (subject to the Court's availability):**

| Event | Proposed Date |
|---|---|
| Deadline to file Contracts Schedule and serve Cure Notices | January 12, 2018 |
| Cure Objection Deadline | January 26, 2018 at 4:00 p.m. (prevailing Eastern Time) |
| Supplemental Cure Objection Deadline | Fourteen days after service of a Supplemental Cure Notice |
| Deadline for objecting to sale to Stalking Horse Bidder | March 22, 2018 at 4:00 p.m. (prevailing Eastern Time) |
| Deadline for objecting to sale to Successful Bidder (other than Stalking Horse Bidder) | March 28, 2018 at 12:00 p.m. (prevailing Eastern Time) |
| Adequate Assurance Objection Deadline; Sale Hearing | March 29, 2018 at 10:00 a.m. (prevailing Eastern Time) |

7

- **Bid Deadline:** The following parties must receive a Bid (as defined in the Bidding Procedures) in writing, on or before March 19, 2018 at 4:00 p.m. (prevailing Eastern time) or such other date as may be agreed to by the Debtors, after consulting with the Auction Consultation Parties[5]: (1) the Debtors; (2) proposed co-counsel for the Debtors, Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attn: Gary S. Lee (glee@mofo.com), Jennifer L. Marines (jmarines@mofo.com), Mark A. Lightner (mlightner@mofo.com) and Benjamin W. Butterfield (bbutterfield@mofo.com), and Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn. Monique B. DiSabatino (monique.disabatino@saul.com); (3) investment banker for the Debtors, Jefferies LLC ("Jefferies"), 520 Madison Avenue, New York, NY 10022 Attn: Robert White; (4) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Juliet Sarkessian (Juliet.M.Sarkessian@usdoj.gov); (5)(a) counsel to the Ad Hoc Noteholder Group, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611, Attn: Rick Levy (richard.levy@lw.com), Ted Dillman (ted.dillman@lw.com), and Jason Gott (jason.gott@lw.com); and (b) financial advisor to the Ad Hoc Noteholder Group, Alvarez & Marsal Securities, LLC, 600 Madison Avenue, New York, NY 10022, Attn: George Varughese (gvarughese@alvarezandmarsal.com); Ronak Patel (ronak.patel@alvarezandmarsal.com); and Alexander Ferreira (aferreira@alvarezandmarsal.com); (6) counsel to the DIP ABL Lenders, Goldberg Kohn Ltd., 55 East Monroe Street, Suite 3300, Chicago, Illinois 60603, Attn: Randall L. Klein (randall.klein@goldbergkohn.com), Jeremy M. Downs (jeremy.downs@goldbergkohn.com), Eva D. Gadzheva (eva.gadzheva@goldbergkohn.com); and (7) counsel to the Committee (collectively, the "Bid Notice Parties").

- **Qualification Process:** As set forth in further detail in the Bidding Procedures, in order for a Bid to be a "Qualified Bid," the Bid must, among other requirements: (a) propose a purchase price in writing; (b) if bidding on Assets subject to a Stalking Horse Bid (as defined below), propose a minimum purchase price, including any assumption of liabilities or similar provisions, that in the Debtors' reasonable business judgment, after consulting with the Auction Consultation Parties, has a value greater than the sum of (i) the value of the

---

[5] The "Auction Consultation Parties" are the DIP ABL Agent, the DIP Collateral Trustee, the Required DIP Noteholders, (each as defined in the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code (II) Authorizing Postpetition Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 363, and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing* [Docket No. 59] (such order, including as such order may be entered on a final basis, the "DIP Order")) (represented by Latham & Watkins LLP as counsel to the ad hoc group of DIP Noteholders (as defined in the DIP Order) (such group, the "Ad Hoc Noteholder Group")), and any official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Committee").

purchase price set forth in the Stalking Horse Agreement (as defined below),
(ii) the Break-Up Fee (as defined below), (iii) the Expense Reimbursement
Amount (as defined below), and (iv) the Overbid Protection (as defined below);
(c) provide a good faith deposit in the amount of seven and a half percent (7.5%)
of the purchase price; (d) provide an executed Alternative Asset Purchase
Agreement (as defined in the Bidding Procedures) on the same or better terms as
those contained in the Stalking Horse Agreement; (e) designate any contracts
and leases that the bidder seeks to have the Debtors assume and assign in
connection with the Sale Transaction; and (f) identify all liabilities that it
anticipates assuming in connection with the Sale Transaction.

- **Auction and Auction Procedures:** If two or more Qualified Bids[6] are received
  by the Bid Deadline, the Debtors may seek to conduct an Auction on or before
  March 27, 2018 at 10:00 a.m. (prevailing Eastern Time) at the offices of proposed
  counsel for the Debtors, Morrison & Foerster LLP, 250 West 55th Street, New
  York, New York 10019.  If only one Qualified Bid has been received the Debtors
  may cancel the Auction.

## B.    Procedures for the Designation of a Stalking Horse Bidder

13.    Pursuant to the Bidding Procedures, the Debtors request authority from the Court

to negotiate the terms of and enter into one or more purchase agreements (each, a "Stalking

Horse Agreement") (subject to higher or better bids as contemplated herein) providing for the

purchase of up to substantially all of the Assets, for the purposes of establishing minimum

acceptable bid(s) with which to begin the Auction (each such bid, a "Stalking Horse Bid," and

such bidder, a "Stalking Horse Bidder").[7]  For the avoidance of doubt, proposed Stalking Horse

Bids may contemplate the purchase of less than all or substantially all of the Assets and the

Debtors will consider separate proposed Stalking Horse Bids for the RANA business segment

and the RAEU business segment, in addition to bids for the entire Real Alloy business.

---

[6] For the purpose of determining whether an Auction will occur, the Stalking Horse Bid(s), if any, will be deemed to be Qualified Bid(s).

[7] The Debtors reserve the right to consider two or more bids for portions of the Assets as Stalking Horse Bids to the extent that such bids, when taken in the aggregate, constitute the highest or best offer for the Assets.

14.     The Debtors request that parties that are interested in serving as a Stalking Horse Bidder submit non-binding indications of intent to the Debtors and Jefferies by December 20, 2017 at 4:00 p.m. (prevailing Eastern Time).  Parties that are interested in serving as a Stalking Horse Bidder must submit a final binding proposal to Jefferies and proposed counsel to the Debtors by January 18, 2018 (the "Final Stalking Horse Proposal Deadline").  The Debtors shall file a notice of entry into any Stalking Horse Agreement(s) (a "Stalking Horse Notice") with the Court on or before January 23, 2018 (the "Stalking Horse Notice Deadline"), which notice(s) shall include any proposed Stalking Horse Agreement(s) (including a proposed Sale Order with respect thereto) and set forth the terms of the Bid Protections proposed to be given to any Stalking Horse Bidder(s).

15.     The Debtors shall serve any Stalking Horse Notice on: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Assets during the past eighteen (18) months; (b) all entities known to have asserted any interest in or upon any of Assets; (c) all federal, state and local regulatory or taxing authorities or recording offices that have a reasonably known interest in the relief requested by this Motion; (d) the Internal Revenue Service; (e) counsel to the Committee; (f) the parties included on the Debtors' list of thirty (30) largest unsecured creditors; (g) those parties who have made the appropriate filings requesting notice of all pleadings filed in the chapter 11 case; (h) the U.S. Trustee; (i) the Securities and Exchange Commission; (j) Wilmington Trust, N.A.; (k) counsel to the Ad Hoc Noteholder Group; (l) counsel to the DIP ABL Lenders; (m) the United States Environmental Protection Agency; (n) the Securities and Exchange Commission; (o) the Office of the United States Attorney General for the District of Delaware; (p) the offices of the attorneys general for the states in which the Debtors operate; and (q) the United States Department of Justice

(collectively, the "<u>Transaction Notice Parties</u>"), with no further notice being required.  Subject to the terms of the DIP Order, including the milestones set forth therein, the Debtors shall have the right to extend or waive the Final Stalking Horse Proposal Deadline and the Stalking Horse Notice Deadline (provided that such deadlines may be extended by the Debtors and Required DIP Noteholders (and, as applicable, DIP ABL Agent) consistent with the DIP Order).

16.     The Transaction Notice Parties shall have until seven (7) calendar days from the filing of a Stalking Horse Notice (the "<u>Stalking Horse Objection Deadline</u>") to file an objection to the Debtors' selection of a Stalking Horse Bid for the purpose of conducting the Auction or any proposed Bid Protections related thereto (the "<u>Stalking Horse Objection Period</u>") and serve such objection upon the Transaction Notice Parties.  Once the Stalking Horse Objection Deadline has passed, the Court may enter an order (the "<u>Stalking Horse Approval Order</u>") approving the Debtors' selection of a Stalking Horse Bid for the purposes of conducting the Auction, and the Bid Protections related thereto, (x) upon certification of counsel if no objection from any of the Stalking Notice Parties has been received within the Stalking Horse Objection Period, or (y) after an emergency hearing if an objection from any of the Transaction Notice Parties has been received prior to the Stalking Horse Objection Deadline.

**C.     Procedures Related to Potential Bid Protections**

17.     The Debtors contemplate that bid protections (in the form of expense reimbursement, a break-up fee, and a minimum overbid) may be necessary to incentivize potential purchasers to engage in the sale process and agree to act as Stalking Horse Bidders.  However, at the request of the U.S. Trustee, the Debtors are not seeking approval of specific bid protections through this Motion, but instead are seeking approval of a process by which they can negotiate such protections and provide parties-in-interest with notice and an opportunity to object to any such protections.

ny-1305920

18.    Accordingly, the Debtors may offer any Stalking Horse Bidder: (a) a break-up fee (the "Break-Up Fee"); (b) reimbursement of all or a portion of the Stalking Horse Bidder's reasonable fees and expenses, in an amount to be negotiated (the "Expense Reimbursement"); and/or (c) an initial overbid increment over the total purchase price guaranteed by such Stalking Horse Bidder (the "Overbid Protection" and together with the Break-Up Fee and the Expense Reimbursement, the "Bid Protections"). All Bid Protections must be acceptable to the Stalking Horse Approval Parties. Upon entry of the Stalking Horse Approval Order, the proposed Bid Protections shall be approved by the Court and shall, upon the Debtors' entry into the respective Stalking Horse Agreement, be granted administrative expense priority under Bankruptcy Code sections 503(b) and 507(a)(2).

**D.    Notice Procedures**

19.    On or before the date that is twenty-one (21) calendar days prior to the Sale Hearing (the "Mailing Date"), in accordance with Bankruptcy Rule 2002(a) and (c), the Debtors (or their agents) shall serve the auction and sale notice (the "Auction and Sale Notice"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**, by first-class mail, postage prepaid, upon the Transaction Notice Parties and upon all other known creditors of the Real Alloy Debtors.

20.    The Auction and Sale Notice shall indicate that copies of the Motion and the Bidding Procedures can be obtained on the website of the Debtors' claims and noticing agent, Prime Clerk, https://cases.primeclerk.com/realindustry/. The Auction and Sale Notice will also indicate the deadline for objecting to the Sale Transaction to the Successful Bidder and the date and time of the Sale Hearing. In addition, the Auction and Sale Notice shall provide notice that the Debtors will seek to assume and assign certain executory contracts to be identified in accordance with the Assumption and Assignment Procedures (as described further below) at the

12

Sale Hearing.  The Debtors request that such notice be deemed to be sufficient and proper notice of the Sale Transaction with respect to known interested parties.

21.    <u>Publication Notice</u>: The Debtors also propose, pursuant to Bankruptcy Rules 2002 and 6004, to publish a notice of the proposed Sale Transaction, in substance substantially similar to the Auction and Sale Notice, in American Metal Market Daily on the Mailing Date or as soon as practicable thereafter.  The Debtors request that such publication notice be deemed sufficient and proper notice of the Sale Transaction to any other interested parties whose identities are unknown to the Debtors.

**E.    <u>Assumption and Assignment Procedures</u>**

22.    The Debtors contemplate that a sale of Assets will include the assumption and assignment of certain executory contracts and unexpired leases and propose the following procedures for notifying counterparties to executory contracts and unexpired leases of potential cure amounts and the proposed assumption and assignment of their executory contracts or unexpired leases.

23.    On or before January 12, 2018, the Debtors will file a schedule (the "<u>Contracts Schedule</u>") listing all of the Real Alloy Debtors' executory contracts and unexpired leases (the "<u>Contracts</u>"), which shall include the amounts that the Debtors believe are necessary to assume the Contracts (the "<u>Cure Amounts</u>").  The Contracts Schedule and Cure Amounts shall also be posted on the Debtors' website maintained by Prime Clerk.  On or before January 12, 2018, the Debtors will also serve a notice (the "<u>Cure Notice</u>"), substantially in the form attached to the Bidding Procedures Order as **<u>Exhibit 3</u>**, on each counterparty to each Contract set forth on the Contracts Schedule (the "<u>Contract Notice Parties</u>").  The Cure Notice shall (a) state the Cure Amount; (b) notify the non-Debtor party that such party's contract or lease may be assumed and assigned to a purchaser of Assets at the conclusion of the Sale Hearing; (c) state the date of the

13

Sale Hearing and that objections to any Cure Amount or to assumption and assignment of any

Contract will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors;

and (d) state a deadline by which the Contract counterparty shall file an objection to the Cure

Amount or to the assumption and assignment of its Contracts; *provided, however*, that the

inclusion of a contract, lease, or agreement on the Cure Notice or the Contracts Schedule shall

not constitute an admission that such contract, lease, or agreement is an executory contract or

lease.[8]

24.     The Debtors request that the Court set the deadline to object to any Cure Amount

or to assumption and assignment on any basis other than an Adequate Assurance Objection (as

defined below) as the date that is fourteen (14) calendar days after service of the Cure Notice

(the "Cure Objection Deadline") and require that any such objections be served on: (a) the

Debtors; (b) proposed co-counsel for the Debtors; (c) the U.S. Trustee; (d) counsel to the Ad Hoc

Noteholder Group; (e) counsel to the DIP ABL Lenders; (f) counsel to the Committee; (g) any

Successful Bidders (if no Successful Bidders have been selected for any Assets, any Stalking

Horse Bidders for such Assets) (the "Cure Objection Notice Parties").  Any such objection shall

(a) be in writing, (b) state the basis for such objection, and (c) if such objection is to the Cure

Amount, state with specificity what cure amount the party to the Contract believes is required (in

all cases with appropriate documentation in support thereof).

25.     To the extent that the Debtors wish to amend the Contracts Schedule, the Debtors

may file supplements (each, an "Supplemental Contracts Schedule") setting forth the Contracts

that have been added to, or removed from, the Contracts Schedule and any modification to the

proposed Cure Amount for any Contract.  The Debtors will also serve, in connection therewith, a

---

[8] For the avoidance of doubt, the Debtors reserve all of their rights, claims, and causes of action with respect to the contracts and leases listed on the Cure Notice and the Contracts Schedule.

supplemental Cure Notice (each, a "Supplemental Cure Notice") on each counterparty to a Contract identified on such Supplemental Contracts Schedule.  The Debtors request that, with respect to any Supplemental Cure Notice, the Court (a) set the deadline to object to any Cure Amount or to assumption and assignment on any basis other than an Adequate Assurance Objection as the date that is fourteen (14) calendar days after service of the Supplemental Cure Notice (the "Supplemental Cure Objection Deadline"), (b) require that any such objections be served on the Cure Objection Notice Parties, and (c) require that any such objection be heard at the Sale Hearing (to the extent such hearing has not occurred as of the Supplemental Cure Objection Deadline) or at a later hearing, as determined by the Debtors.

26.     At the Sale Hearing, only those executory contracts and unexpired leases (and the corresponding Cure Amounts) listed on the Cure Notice that have been selected to be assumed by the Successful Bidder at the Auction (as may be amended in accordance with the terms of the applicable definitive documents, the "Selected Contracts") shall be subject to approval by the Court, and the Debtors shall reserve their rights for all other contracts.  The Debtors shall (a) present evidence necessary to demonstrate adequate assurance of future performance by the Successful Bidder and (b) request entry of a Sale Order that, among other things, approves the assumption and assignment of any Selected Contracts to the Successful Bidder.  Objections to the ability of the Successful Bidder to demonstrate adequate assurance of future performance (an "Adequate Assurance Objection") with respect to any Selected Contracts may be presented at the Sale Hearing (the "Adequate Assurance Objection Deadline").

27.     The Debtors request that the Bidding Procedures Order provide that unless a non-Debtor party to any executory contract or unexpired lease files an objection to the Cure Amount by the Cure Objection Deadline or Supplemental Cure Objection Deadline, or Adequate

Assurance Objection by the Adequate Assurance Objection Deadline, such counterparty shall be forever barred and estopped from (a) objecting to the Cure Amount and (b) asserting or claiming any Cure Amount against the Debtor, any Successful Bidder, or any other assignee of the relevant contract, other than the Cure Amount listed on the Cure Notice or Supplemental Cure Notice (as applicable).

28.     The Debtors request the ability, in consultation with the Required DIP Noteholders and DIP ABL Agent, to settle on a consensual basis any dispute regarding a Cure Amount without further order of the Court.  The Debtors shall provide three (3) calendar days' notice of any such compromise to the DIP ABL Agent, the DIP Collateral Trustee, the Required DIP Noteholders, and the Committee, during which time such parties may object.  If no objections are filed within that period, the Debtors request that such objection be deemed waived.

## **RELIEF REQUESTED**

29.     The Debtors seek entry of the Bidding Procedures Order, substantially in the form attached thereto as **Exhibit 1**, (a) approving the proposed Auction and Bidding Procedures for the sale of Assets, (b) establishing the Assumption and Assignment Procedures, (c) establishing procedures in connection with the selection of Stalking Horse Bidders and protections to be afforded thereto, (d) approving the form and manner of notice of all procedures, protections, schedules, and agreements, (e) scheduling a Sale Hearing to approve the Sale Transaction, and (f) granting related relief.  Further, the Debtors also hereby move for entry of the Sale Order (x) approving the sale of the Assets free and clear of all Interests to the Successful Bidder pursuant to the Asset Purchase Agreement, (y) authorizing the assumption and assignment of certain executory contracts and unexpired leases, and (z) granting related relief.

16

## BASIS FOR RELIEF REQUESTED

**A.    Approval of the Sale Transaction is Appropriate
Under Section 363 of the Bankruptcy Code**

30.    Bankruptcy Code section 363 provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).  Once a court determines that a valid business justification exists for a sale outside of the ordinary course of business, the courts must determine whether: (a) adequate and reasonable notice of the sale was given to interested parties; (b) the sale will produce a fair and reasonable price for the property; and (c) the parties have acted in good faith.  *In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012); *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).

31.    As described below, the proposed Sale Transaction meets each of these requirements.

**1.    The Sale Transaction Represents a Sound
Exercise of the Debtors' Business Judgment**

32.    Here, a strong business justification exists for the Sale Transaction.  As described above and in the First Day Declaration, the Real Alloy Debtors have determined that a going concern sale is the only feasible way to resolve their liquidity constraints, deleverage their capital structure, and preserve value for all stakeholders, including employees, vendors, and customers.

As a result, an expeditious sale of the Assets is a reasonable exercise of the Debtors' business judgment and is in the best interests of all of the Real Alloy Debtors' stakeholders.

 **2.**  **The Bidding Procedures are Fair and are Designed
    to Maximize the Value Received For the Assets**

 33.  The Debtors believe that the Bidding Procedures satisfy each of the remaining requirements for approval of a sale under Bankruptcy Code section 363 by (a) providing more than ample notice of each element of the proposed sale process, (b) facilitating a value maximizing sale, and (c) ensuring an unbiased and good faith sale process. The detailed Bidding Procedures outlined above and in **Exhibit 1** to the proposed Bidding Procedures Order provide notice designed to fully inform all parties with a stake in the sale process regarding the portions of the sale process most relevant to their interests. For example, the Bidding Procedures ensure that entities asserting an interest in the Assets or that are party to the Selected Contracts will receive notice of the proposed Sale Transaction, the procedures for objecting to the Sale Transaction, or the assumption and assignment of their respective contracts or leases (as applicable). Similarly, the Bidding Procedures outline all material aspects of the potential purchaser notification, bid qualification, due diligence, bid submission, bid selection, and auction process, including the timing for each. Thus, the Bidding Procedures provide assurance to each entity potentially interested in purchasing the Assets that their respective rights will be protected and the Sale Transaction process will be fair and reasonable. At the same time, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select, in its reasonable business judgment, and after consultation with the Auction Consultation Parties, the highest and best offer for the Assets. Accordingly, the Debtors believe the Court should approve the Bidding Procedures.

34.    The Debtors submit that similar bidding procedures have been approved in the Third Circuit. *See, e.g.*, *In re Ciber, Inc.*, No. 17-10772 (BLS) (Bankr. D. Del. May 2, 2017) [ECF No. 150]; *In re Sungevity, Inc.* (KG) (Bankr. D. Del. March 31, 2017); *In re Savient Pharm., Inc.*, No. 13-12680 (MFW) (Bankr. D. Del. Nov. 4, 2013) [ECF No. 110]; *In re IPC Int'l Corp.*, No. 13-12050 (MFW) (Bankr. D. Del. Aug. 27, 2013) [ECF No. 98]; *In re Northstar Aerospace (USA) Inc.*, No. 12-11817 (MFW) (Bankr. D. Del. June 27, 2012) [ECF No. 119].[9]

### 3.    Ability to Enter into Stalking Horse Agreement and Provide the Bid Protections in Connection Therewith

35.    Pursuant to the Motion, the Debtors are seeking the approval of this Court to allow the Debtors to choose a Stalking Horse Bidder at any time after entry of the Bidding Procedures Order and to offer such bidder the Bid Protections, in accordance with the procedures set forth above and in the Bidding Procedures Order.  The Debtors require flexibility to offer the Bid Protections in order to incentivize potential bidders to serve as the Stalking Horse Bidder and to secure a "floor" purchase price.  These Bid Protections are only earned if the Stalking Horse Bidder is not the Successful Bidder, in which case the Bid Protections will be offset by a higher purchase price.  The Debtors believe that the ability to offer the Bid Protections to the Stalking Horse Bidder will ensure the Debtors' ability to maximize the realizable value of the Assets for the benefit of the Debtors' estate, its creditors, and other parties-in-interest.

36.    The United States Court of Appeals for the Third Circuit has held that break-up fees and expense reimbursements must meet the standards applicable to the allowance of administrative expenses under Bankruptcy Code section 503(b).  *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (citing *In re Calpine Corp. v. O'Brien Envt'l*

---

[9]  Due to the voluminous nature of the orders cited herein, the orders are not attached as exhibits to the Motion.  Copies of these orders are available on request of the Debtor's counsel.

*Energy, Inc. (In re O'Brien Envt'l Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999)).  The Third

Circuit has identified at least two instances in which bidding incentives may benefit the estate.

First, a break-up fee or expense reimbursement may be necessary to preserve the value of the

estate if the assurance of the fee "promote[s] more competitive bidding, such as by inducing a

bid that otherwise would not have been made and without which bidding would have been

limited." *O'Brien*, 181 F.3d at 537.  Second, if the availability of break-up fees and expenses

induced a bidder to "research the value of the debtor and convert that value to a dollar figure on

which other bidders can rely, the bidder may have provided a benefit to the estate by increasing

the likelihood that the price at which the debtor is sold will reflect its true worth."  *Id.*

37.    The maximum amount of the Break-Up Fee is expected to be reasonable and

consistent with the range of bid protections typically approved by bankruptcy courts in the Third

Circuit and will be subject to disclosure, the opportunity for interested parties to object, and

Court approval.  *See, e.g.*, *In re Synagro Techs.*, Inc., Case No. 13-11041 (BLS) (Bankr. D. Del.

May 13, 2013) [ECF No. 137] (approving break-up fee of 3.0% in connection with a $455

million sale of assets); *In re Vertis Holdings, Inc.*, Case No. 12-12821 (CSS) (Bankr. D. Del.

Nov. 2, 2012) [ECF No. 206] (court approved break-up fee of 3.0% in connection with a $258

million sale of assets); *In re Solyndra LLC*, Case No. 11-12799 (MFW) (Bankr. D. Del. Sept. 28,

2012) [ECF No. 1113] (court approved break-up fee of 2.6% in connection with a $90 million

sale of assets); *In re Northstar Aerospace (USA) Inc.*, Case No. 12-11817 (MFW) [ECF No. 119]

(Bankr. D. Del. June 27, 2012) (court approved break-up fee of 3.5% in connection with

$70 million sale of assets); *In re Eddie Bauer Holdings, Inc.*, Case No. 09-12099 (MFW) (Bankr.

D. Del. June 30, 2009) [ECF No. 222] (court approved break-up fee of 2.5% in connection with a

$202 million sale of assets).

38.     Subject to the expiration of the Bid Protections Objection Deadline, the Bid Protections should be approved, and accorded administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code, because they provide a clear benefit to the Real Alloy Debtors' estates.  By conducting due diligence and participating in negotiations for a potential Sale Transaction, the Real Alloy Debtors submit that, to the extent they determine that it is in the best interests of their estates to enter into a Stalking Horse Agreement, the Bid Protections will benefit the estates because the Stalking Horse Bidder will have established a bid standard, including a price floor, and initiated a sale process that may serve as a catalyst for other bidders.  Moreover, each of the Transaction Notice Parties will have the ability to object to the proposed Bid Protections.

**B.      The Proposed Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) For a Sale Free and Clear of Interests**

39.     The Sale also meets the requirements to be a sale free and clear of Interests.

Bankruptcy Code section 363(f) provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

ny-1305920

40.     A sale that meets the requirements for a sale free and clear of Interests pursuant to Bankruptcy Code section 363(f) also bars claimants from asserting successor liability against the successful purchaser.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *In re NE Opco, Inc.*, 513 B.R. 871, 876 (Bankr. D. Del. 2014); *In re Ormet Corp.*, No. 13-10334 (MFW), 2014 WL 3542133, at *3 (Bankr. D. Del. July 17, 2014); *Amphenol Corp. v. Shandler (In re Insilco Techs, Inc.)*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory).

41.     Here, substantially all the Assets are encumbered by liens.  The Debtors expect that, based upon market indications, it is possible that the proposed purchase price will be more than sufficient to satisfy the requirements of Bankruptcy Code section 363(f)(3).  The Debtors also anticipate continuing to work closely with the Ad Hoc Noteholder Group, the DIP ABL Lenders, and the Debtors' other prepetition secured creditors to achieve a sale that they find acceptable.  As a result, the Debtors anticipate that the Sale Transaction will also satisfy Bankruptcy Code section 363(f)(2) and a sale free and clear of purported liens on the Assets and any other Interests will be appropriate.

**C.     A Successful Bidder Should Be Afforded the
        Protections of Bankruptcy Code Section 363(m)**

42.     Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs., Ltd.* (*In re Mark Bell Furniture Warehouse, Inc.*), 992 F.2d 7, 8 (1st Cir. 1993).

22

43.     The Debtors will present facts at the Sale Hearing to demonstrate that the applicable Asset Purchase Agreement was negotiated at arm's-length, with both parties represented by their own counsel.  Accordingly, the Debtors request that the Sale Order include a provision concluding that the Successful Bidder is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.  The Debtors believe that providing the Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors and the closing of the same will occur promptly.

**D.      Assumption and Assignment of the**
**Selected Contracts Should be Authorized**

44.     Bankruptcy Code section 365(a) provides, in relevant part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Further, Bankruptcy Code section 365(f) provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance . . . is provided . . . ."  11 U.S.C. § 365(f)(2).  Assumption and assignment of the Selected Contracts in connection with the Sale is appropriate.

**1.      Assumption of the Selected Contracts is a**
**Reasonable Exercise of the Debtors' Business Judgment**

45.     Assumption or rejection of a contract is a matter of the debtor's business judgment.  *See Nat'l Labor Relations Bd. v. Bildisco and Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd sub nom. N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513 (1984) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test."); *In re Physiotherapy Holdings, Inc.*, 506 B.R. 619, 622 (Bankr. D. Del. 2014) (citing *Computer Sales Int'l, Inc. v. Fed. Mogul Glob., Inc. (In re Fed. Mogul Glob., Inc.*, 293 B.R. 124, 126 (D. Del. 2003)).  A debtor's decision in this regard is

23

"entitled to great deference from the Court." *See In re Armstrong World Indus.*, 348 B.R. 136, 162 (Bankr. D. Del. 2006). In order to satisfy the business judgment test, a debtor must only show that assumption or rejection of an executory contract will benefit the estate. *See In re Bildisco*, 682 F.2d at 79; *see also In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) ("Under the business judgment standard, the sole issue is whether the rejection benefits the estate." (citation omitted)).

46.     To facilitate and affect the Sale Transaction and to maximize the value received for the Assets, the Debtors requests approval under Bankruptcy Code section 365 of the Real Alloy Debtors' assumption and assignment of the Selected Contracts to the Successful Bidder. Certain of the Real Alloy Debtors' executory contracts and unexpired leases will be necessary for the Successful Bidder's continued operation of the Assets.

47.     The Debtors further requests that the Sale Order provide that the Selected Contracts will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder, notwithstanding any provisions in the Selected Contracts, including those described in Bankruptcy Code sections 365(b)(2), 365(f)(1), and 365(f)(3) that prohibit such assignment.

**2.      Any Defaults Under the Selected Contracts Will be Cured and Evidence of Adequate Assurance of Future Performance by the Successful Bidder Will be Provided**

48.     Once an executory contract is assumed, the trustee or debtor in possession may generally elect to assign such contract, so long as it cures any defaults and provides adequate assurance of future performance. *See* 11 U.S.C. § 365(f)(2)(B) (a debtor may assign an executory contract or unexpired lease of nonresidential property if "adequate assurance of future performance by the assignee of such contract or lease is provided . . . ."). The requirements to show "adequate assurance of future performance" will depend on the facts and circumstances of

24

each case, but should be given a "practical, pragmatic construction." *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001); *In re Decora Indus.*, No. 00-4459 JJF, 2002 WL 32332749, at *8 (D. Del. May 20, 2002) ("adequate assurance falls short of an absolute guaranty of payment."). Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

49.      The Debtors contemplate that the Successful Bidder will be able to provide adequate assurance of future performance in connection with any Selected Contracts because such Successful Bidder must submit evidence sufficient to demonstrate its financial wherewithal and ability to consummate the Sale Transaction.  The Debtors will present facts at the Sale Hearing to show the financial wherewithal, willingness, and ability of the Successful Bidder to perform under the Selected Contracts.  The Sale Hearing thus will afford the Court and other interested parties the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under the Selected Contracts, as required under Bankruptcy Code section 365(f)(2)(B).

50.      Moreover, as set forth above, the Debtors have proposed to file a list of the Contracts and the Cure Amounts that the Debtors believe are due under each such Contract.  The Debtors will serve a Cure Notice on all Contract Notice Parties, and provide them with an opportunity to be heard.  In the absence of an objection by a non-Debtor party to a Contract, such

party will receive the specified Cure Amounts, if any, at the closing of the Sale Transaction in accordance with the terms of the applicable Asset Purchase Agreement (or otherwise).

51.     Accordingly, the Debtors submit that implementation of the Assumption and Assignment Procedures regarding the potential assumption and assignment of Contracts is appropriate in this case.  The Court, therefore, will have a sufficient basis to authorize the Debtors to assume and assign the Selected Contracts as will be set forth in the applicable Asset Purchase Agreement.

**WAIVER OF BANKRUPTCY RULE 6004(h) AND 6006(d)**

52.     To implement the foregoing immediately, the Debtors seek a waiver of the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) and the assumption and assignment of the Selected Contracts under Bankruptcy Rule 6006(d).

**NOTICE**

53.     Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel: (a) the Office of the United States Trustee; (b) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis, excluding insiders); (c) Wilmington Trust, N.A.; (d) the Securities & Exchange Commission; (e) the Office of the United States Attorney General for the District of Delaware; (f) the offices of the attorneys general for the states in which the Debtors operate; (g) the Internal Revenue Service; (h) the U.S. Department of Justice; (i) counsel to the Ad Hoc Noteholder Group; (j) counsel to the DIP ABL Lenders; (k) the United States Environmental Protection Agency.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

26

## CONCLUSION

WHEREFORE the Debtors respectfully request entry of orders granting the relief requested herein, and such other and further relief as is just.

Dated: November 28, 2017
       Wilmington, Delaware

*/s/ Monique B. DiSabatino*
Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
SAUL EWING ARNSTEIN & LEHR LLP
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, Delaware 19899
Telephone: (302) 421-6840
Facsimile: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

Sharon L. Levine (*admitted pro hac vice*)
SAUL EWING ARNSTEIN & LEHR LLP
1037 Raymond Boulevard, Suite 1520
Newark, New Jersey 07102
Telephone: (973) 286-6718
Facsimile: (973) 286-6821
sharon.levine@saul.com

-and-

Gary S. Lee (*admitted pro hac vice*)
Jennifer L. Marines (*pro hac vice* admission pending)
Mark A. Lightner (*admitted pro hac vice*)
Benjamin Butterfield (*admitted pro hac vice*)
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
glee@mofo.com
jmarines@mofo.com
mlightner@mofo.com
bbutterfield@mofo.com

*Proposed Counsel for Debtors and*
*Debtors-in-Possession*